UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| That's What She Said, Inc., ) | |
| ) | CIVIL ACTION NO. _____ |
| Plaintiff, ) | |
| ) | |
| vs. ) | COMPLAINT FOR BREACH OF |
| ) | CONTRACT, ANTICIPATORY BREACH |
| Gutter Games Ltd. and Perch UK 1 Ltd., ) | OF CONTRACT, AND BREACH OF THE |
| ) | COVENANT OF GOOD FAITH AND FAIR |
| Defendants. ) | DEALING |
| _____ ) | |

## COMPLAINT

Plaintiff That's What She Said, Inc. ("TWSS" or "Plaintiff") alleges for its

Complaint against Gutter Games Ltd. ("Gutter Games" or "GG") and Perch UK 1 Ltd. ("Perch")

as follows:

## Introduction

1.     This Complaint relates the history of Gutter Games (and its owners,

Zachary Walton and Katherine Walton (collectively, the "Waltons")), who badly needed

expertise and assistance bringing its products to market in the United States after having tried

and failed for two years to expand from its home market in the United Kingdom.  Plaintiff

entered into a 14-year contract with GG (which was later acquired by Defendant Perch) to

provide that expertise and assistance, and invested enormous amounts of time and in the

neighborhood of $10 million to develop the market so that both Plaintiff and GG could look

forward to more than a decade of consistent profits for all involved.  At that point, however, GG

and Perch announced that they would no longer comply with the agreement, in an apparent effort simply to take the profits that belong to Plaintiff, in an amount reasonably estimated to exceed $35 million.

## The Parties

2.      Plaintiff TWSS is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Washington.

3.      Defendant GG is an entity organized and existing under English law that, although known as a "limited liability company" under English law, is most analogous to a "corporation" as that term is used in the 50 States of the United States.  Its principal place of business is in the United Kingdom.

4.      Defendant Perch is an entity organized and existing under English law that, although known as a "limited liability company" under English law, is most analogous to a "corporation" as that term is used in the 50 States of the United States.  Its principal place of business is in the United Kingdom.

## Jurisdiction and Venue

5.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(2), as it involves citizens of a State and citizens of a foreign State and the amount in controversy, excluding costs and fees, exceeds $75,000.

6.      This Court has personal jurisdiction over Defendants, because Defendants agreed to the jurisdiction of this Court in the agreement among the parties, as further described below; because Defendants have purposefully availed themselves of the privilege of conducting business in this jurisdiction and invoked the benefits and protections of the law of this jurisdiction; and the exercise of personal jurisdiction is reasonable.

7.      Venue with is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2), as both GG and Perch are subject to personal jurisdiction in this District and thus deemed to reside here.

8.      Pursuant to Rule 18(a)(3) of the local Rules for the Division of Business Among District Judges, this matter is properly assigned to the Manhattan courthouse.

## Factual Allegations

Background of the Agreement

9.      TWSS is and at all relevant times has been in the business of creating, developing, producing, and selling physical game products throughout the United States, including through online distributors such as Amazon and brick/mortar distributors such as Target.  It has a long track record of significant profitability, obtained through the exploitation of its acumen, creativity, experience, and strong industry relationships.

10.      GG was and may still be a company that created and sold physical games in the United Kingdom (and possibly other jurisdictions).  They do not operate in the United States because their previous efforts to do so were not successful, leading them to realize that they needed significant assistance with the U.S. market.  The Waltons were its principals and sole owners until at least September 2021.

11.      Because GG had been unsuccessful in its approximately two years of attempting to sell its products in the United States and had no feasible method of developing the expertise and resources to successfully operate in the United States (which has a games market larger than the U.K. market), GG contacted TWSS in 2019 and the companies began negotiations regarding the possibility of TWSS becoming the exclusive holder of rights to "manufacture, make, sell, distribute, promote and market" game products owned by GG in the United States.

12.      These negotiations resulted in a *Gutter Games – That's What She Said Brand/Product License Agreement* dated September 12, 2019 (the "Agreement"; copy attached hereto), which was duly and properly executed by Zachary Walton for GG and President Dan Myers for TWSS.

13.      A critical part of the negotiations leading to the Agreement was the importance of ensuring that the Agreement would continue for a long period of time so that

TWSS would have the opportunity to recoup and profit from the very significant investments (in the neighborhood of $10 million) it would be required to make in the beginning period of the Agreement.  Gutter Games confirmed that necessity in (among other things) a written comment from Zachary Walton in a draft of the Agreement exchanged between the parties, stating "TWSS wants a guarantee of longevity to give them the confidence to invest marketing dollars, time, & effort.  GG want[s] a guarantee TWSS will perform highly for the duration of the contract."

Central Terms of the Agreement

14.     The Agreement provides to TWSS an exclusive license to "manufacture, make, sell, distribute, promote and market the Games within the United States and Canada" in exchange for payment to GG of a specified royalty on the sales made by TWSS.  Notably, the 8% royalty rate in the Agreement is significantly above the industry standard, a concession that TWSS offered in a good-faith exchange for the guarantee of longevity.  The Agreement defines "Games" as six particular games listed in Schedule A of the Agreement, with the proviso that additional games could be added as Games to the Agreement, and that expansions or separate editions of existing Games would be added to the Agreement.

15.     The Agreement includes no set termination date.  Rather, the initial term of the Agreement is eight years, until December 31, 2027, after which the Agreement will "automatically renew for successive renewal terms of one (1) year each, unless earlier terminated in accordance with this Section [9]."  The Agreement includes sales targets for 13 years, demonstrating the parties' expectation (repeatedly discussed during negotiations of the Agreement) that the Agreement would have a duration of 14+ years.

16.     The Agreement empowers TWSS to terminate the Agreement without cause (upon six months' notice) at any point after September 12, 2021, and GG to terminate the Agreement without cause (upon six months' notice) at any point after September 12, 2033 – a disparity that reflected the significant initial investment in the Agreement to be made by TWSS.  Through the end of 2021, TWSS invested in the neighborhood of $10 million in the project.

4

17.     The Agreement further provides that "TWSS shall use commercially reasonable efforts to meet the applicable minimum sales targets for the Products set forth in Schedule C . . . ."  Schedule C includes targets for each individual Game and for the combination of all six Games (the "All Products" target).  In addition, for each of the seven sales target categories, two separate sales targets are applicable – the first being a specific number of units for each particular year, and the second being that sales must be three times the number of units sold by GG in the United Kingdom (the "3x Sales Target").

18.     The Agreement provides that a failure to meet an All Products target or the target for an individual Game would give GG certain rights set out in Section 6 of the Agreement, including in limited circumstances the right to terminate the Agreement.  Those rights, however, would not be applicable if a failure to reach one or more targets was caused by a "force majeure" event.  The Agreement provides:  "Neither party shall be liable for any failure or delay of performance due to any cause beyond its reasonable control, including, without limitation, any act of God, governmental act, fire, strike, labor slowdown, war, riot, terrorism, *delays in transportation not within a party's reasonable control*, or *inability to obtain necessary labor, materials or manufacturing facilities*."  Agreement ¶ 14 (the "Force Majeure Provision") (emphasis added).

19.     The Agreement further permits termination of the Agreement "if (i) insolvency, bankruptcy or similar proceedings are instituted by or against such party, (ii) there is any assignment or attempted assignment by such party for the benefit of creditors, (iii) there is any appointment, or application of [*sic*] such appointment of a receiver for such party; or (iv) there is a sale or transfer of all or substantially all of the assets, or a merger or consolidation of such party or a transfer of ownership that results in a change of control of such party."  Agreement ¶ 9(f) (the "Change of Control Provision").

20.     The Agreement includes a choice of law and choice of forum provision providing in pertinent part:  "This Agreement shall be construed in accordance with the law of the state of New York, United States, without respect to its choice of law principles.  . . .  Any

legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in New York City, United States, and each party irrevocably consents to personal jurisdiction and venue therein and waives any claim of improper venue or inconvenient forum." Agreement ¶ 16.

      21.    Finally, the Agreement provides that "[i]n the event of a dispute arising out of or relating to this Agreement, the prevailing party shall be entitled to receive from the other party its reasonable attorneys' fees and costs." Agreement ¶ 16.

Performance Under the Agreement

      22.    Through the beginning of 2021, the Agreement was a success, and TWSS very effectively developed and coordinated manufacturing, promotion, and sales of the Games, resulting in consistent high praise from GG. For example, the Agreement provided for a "Minimum Sales Target" of 5,000 units in 2020 for the flagship Game *Beat That*. TWSS sold more than 200,000 units of *Beat That* in 2020, elevating *Beat That* to #2 of all toys and games on Amazon and exceeding the sales target by 4,000%. GG responded with consistent and fulsome praise, writing things like:

      a.    "HOLY CRAP GUYS!!! I can't actually believe it."

      b.    "You guys are smashing it."

      c.    "Firstly WOW that is phenomenal!!! You've all done such an incredible job!"

      d.    "100k units in Dec is massive!"

      e.    "Thanks for being awesome partners and mates. It's been a pleasure working with you all and together we've achieved so much in such a short period of time."

      f.    "We're so thankful for having you guys on board as we really couldn't drop that sort of cash in the US whilst running the UK too."

23.     It appeared likely that TWSS would earn tens of millions of dollars over the 14+ year duration of the Agreement, with concomitant benefits accruing to GG through the associated royalty payments.

24.     Along with the great overall success, during this time period it became clear that some of the Games were not well adapted for the North American market, whether because of cultural differences between U.S. and U.K. consumers, because of salacious content that made the Games difficult or impossible to advertise in the U.S., or other reasons.  The principals of TWSS and GG discussed these issues on a March 5, 2020 video call, during which the Waltons expressed a strong preference for not making changes to the Games that were having difficulty in the North American market.  When TWSS's principals expressed concerns about carrying products that would not perform well without further changes, GG responded that there was no need for TWSS to worry about sales levels and agreed that products would not be taken away from TWSS.  This agreement was repeatedly confirmed in 2020 and 2021, as every time TWSS raised the issue of sales levels, GG reiterated its assurances that sales levels were not a concern.

25.     Based on the success of the relationship up to Spring 2020, after the March 5 call described above GG periodically requested that TWSS provide GG with marketing guidance and access to the tools that had created so much success in North America for GG's own use in the U.K.  TWSS was wary of doing so because of the potential impact on the 3x Sales Target.  In response, Gutter Games confirmed that there was no need to worry about sales levels. Because of that assurance and the relationship of the parties, TWSS provided access to its key tools and detailed guidance on how to increase GG's business, including (a) direct access to and explanations of TWSS's social media marketing funnels; (b) assistance with and edits to video advertisements that GG continues to use to this day; (c) logins to TWSS's paid tools, which helped Gutter Games learn key insights regarding their competitors; (d) consultations regarding the methods and success of GG's UK marketing agency; (e) advice about exploitation of critical

Amazon programs; and (f) new games developed in whole or in part by TWSS.  Gutter Games's
U.K. sales grew significantly because of TWSS's assistance.

26.     Multiple written communications from Gutter Games confirmed that there
was no need to worry about sales levels.  These include for example Ms. Walton's statement on
November 18, 2020:  "I'm going to say we intend to take a min of 5,000 units in UK as a starting
order, do you think you'll do the same in US? (no pressure obvs! [obviously!])," clearly
signaling that TWSS should not be concerned about sales levels, and no push for North
American sales to be triple those in the U.K.

27.     Starting in late 2020 and continuing into 2021, however, the transportation
bottleneck created by the Covid-19 pandemic made it impossible to obtain product – which was
necessarily manufactured in China given the economics of the industry – in anything close to
amounts sufficient to sustain sales, particularly during the crucial holiday season in late 2021.
There was simply no practical way to receive sufficient quantities of the top-selling /
high-volume Games to meet the forecasted demand in the United States and Canada, and thus no
practical way for TWSS to reach the sales targets set out in Schedule C of the Agreement.

28.     Also contributing to the problem were significant factory difficulties.
These included among other things (1) lengthy factory shutdowns mandated by the Chinese
government for reasons related to environmental concerns and electricity shortages; (2) work
stoppages necessitated because factories exceeded their storage capacity when lengthy port
delays and an absence of available containers forced the factories to store assembled inventory
on site because it could not be sent to ports; and (3) issues with manufacturing quality and
associated materials availability that significantly slowed production.

29.     Gutter Games consistently acknowledged the impossible situation created
by the transportation bottleneck and factory issues, which among other things increased
production and freight timelines from approximately 102 days to more than 181 days and raised
the price of a freight container from approximately $4,000 to well over $22,000.  For example:

a.   Ms. Walton: "We had similar issues with our freight forwarder not telling us that the good hadn't been shipped when they were scheduled to, but your situation is even more crazy.  Our Hen Hamper was manufactured after your Bach Bundle run and is arriving in 10 days even with the shipping delays.  The shipping companies are booting containers off last minute to replace them with containers which are priced higher and not informing the freight forwarders is our understanding."

b.   Mr. Walton: "F**k paying $16000 in freight for an initial shipment when you don't have a clue if you're gonna sell the goods."

c.   On July 1, 2021, less than three months before GG announced the sale of their company to Perch, Mr. Myers called Mr. Walton to discuss the transportation and manufacturing delays to ensure that GG had no reservations about TWSS's performance, and Mr. Walton confirmed there was nothing TWSS could have done, saying  "It's just been luck of the draw."

30.   As noted, these transportation difficulties were routinely discussed in 2021 by the principals of TWSS and the principals of GG, Zachary and Katherine Walton.  During each communication (oral and written), the Waltons consistently reassured TWSS that there was no need to worry about sales levels under the circumstances, but that TWSS should instead focus on investing in the brand (*i.e.*, advertising), opening new sales channels (*e.g.*, with retail sales channels like Walmart, Kohl's, and Walgreens, which forecast purchases up to two years in advance), turning down deals that would help hit sales targets but damage the long-term prospects of the brand through margin erosion, and conceptualizing and developing new games and expansions of current Game titles to better position the group for strong sales after the end of the logistics and transportation breakdown that is expected to occur after the pandemic recedes.

31.   TWSS agreed with that strategy (even though it caused a significant negative impact on TWSS's financial performance in 2021), and relied upon the representations

of GG and agreement with GG in pursuing the best long term interest of the enterprise as a whole (*i.e.*, TWSS, GG, and their Agreement) rather than harming the enterprise by undertaking a Herculean, short-sighted, and certainly money-losing effort to meet arbitrary sales targets that could not reasonably be met in the pandemic year without taking a short-term, short-sighted focus that would undermine the future of the enterprise.

32.    There are multiple examples of significant sales that TWSS could and would have made if there were concerns about sales levels as opposed to the overall long-term success of the enterprise.  As one such example, when TWSS and GG discussed *Twelve Games of Christmas*, TWSS noted that it "could probably sell tons of these at discount stores, but if I go that route, there is no going back."  Mr. Walton agreed, stating "Nah, definitely not.  Looks so classy and high end."  Similarly, a discounter approached TWSS in 2021 regarding *Destination Drunk* and placed an order more than five times larger than the total number of units of that game otherwise sold that year.  TWSS could have obtained similar outsized orders for the more popular Games, likely tripling (or more) its 2021 total sales, but TWSS declined to do so, acting for the long-term benefit of the brand because of the assurances that there was no need to worry about sales levels.

The Entrance of Defendant Perch

33.    In Spring 2021, Mr. and Ms. Walton significantly reduced their communications with TWSS.  TWSS repeatedly asked whether there was a reason for the reduced communication, and the Waltons repeatedly responded that it was just that they were focusing on development of new products and on developing relationships that could assist them in markets outside North America.

34.    Because of their unease with the reduced communications, the principals of TWSS again asked the Waltons / GG if there was anything TWSS was not doing or doing incorrectly and if there were any potential difficulties with the relationship moving forward.  The Waltons repeatedly stated that there were no difficulties, that the relationship was excellent, and that there was no reason to be concerned about the Agreement.

35.     In fact, however, those repeated statements were intentionally false.  By at least June 2021, GG was in discussions to sell its business to Perch and (as Mr. Walton later informed TWSS when he disclosed the acquisition) planning to terminate the Agreement pursuant to the Change of Control Provision.  The purpose of this plan was to capture for Perch and GG the benefits and profits derived from the millions of dollars invested by TWSS in developing, marketing, and selling the Games, thus denying those benefits and profits that would belong to TWSS pursuant to the Agreement.

36.     The Waltons, GG, and Perch maintained the secrecy of their plans to induce TWSS to continue to invest in the Games until the deal was completed.  In reliance on the assurances provided by the Waltons and GG (and then later by Perch, as noted below), TWSS continued to invest in the Games for the purposes of maximizing future sales through December 2021, when Perch informed TWSS that it was considering terminating the Agreement.  Such investments totaled more than a million dollars and hundreds of hours of time and effort, including for example:

> a.     The purchase of significant additional inventory, along with the associated freight and storage costs;
>
> b.     Significant (seven-figure) additional expenditures on advertising and marketing;
>
> c.     Large additional investments in the development and maintenance of sales channels and associated relationships; and
>
> d.     Payments to current sales channels, including for example payment for placement on the Amazon holiday list for the purpose of maintaining advantages that would support sales in 2022 and beyond.

37.     Indeed, this secrecy of Defendants' plan to terminate the Agreement was so important to them that GG chose not to consider other potential buyers for GG who knew the principals of TWSS for fear that TWSS would learn of the deception.  For example, when a principal of one international toy company that competes with TWSS and GG asked Mr. Walton

11

why that company was not given a chance to make an offer, Mr. Walton responded that it was because the principal knew TWSS President Dan Myers.

38.     On September 27, 2021, Mr. and Ms. Walton informed TWSS out of the blue that Gutter Games had been "bought" by Defendant Perch, without any clear description of the precise nature of the transaction.  On the same call, the Waltons revealed that GG had been working on the transaction since at least July, and that they intended to use the Change of Control Provision to cancel the Agreement.

39.     After taking control of GG, and even after the Waltons admitted to their previously hidden plans, Perch continued to mislead TWSS regarding its intentions with respect to the Agreement.  For example, on an October 1 call between TWSS and a Perch representative, TWSS noted Mr. Walton's statement about the plan to terminate and described to Perch the reasons that the Change of Control Provision could not justify terminating the Agreement.  In response, the representative denied that Perch had any intention of terminating the Agreement, and stated that his job was to keep everything running smoothly "in the short term".  In addition, throughout October and November, Perch refused TWSS's repeated requests for information about GG's year to date sales and ignored TWSS's requests to plan inventory for 2022.

40.     This intentional deception was implemented to prevent TWSS from dialing back its investments prior to the holiday season.  Indeed, it was not until December 23, shortly after TWSS announced that they were about to make a big inventory order, that Perch announced it was considering terminating the Agreement.  Interestingly, it justified its supposed right to terminate by invoking the sales target provisions, in an apparent concession that the original plan based on the Change of Control Provision could not succeed.  This was the first time that either Defendant had raised sales target performance under the Agreement as an issue.

41.     Notwithstanding the above, TWSS continued performing its obligations under the Agreement, advertising and distributing the Games.  TWSS also continued its efforts, not required by the Agreement, to secure new sales channels, to create and develop new games,

and to pursue new manufacturing and distribution relationships to increase the value of the Agreement to the parties.

Perch's Refusal to Continue the Agreement

42.     On January 21, 2022, Perch sent correspondence to TWSS, purporting to give (on behalf of GG) 90 days' notice of termination of the Agreement, asserting that such termination by GG was permitted by the Change of Control Provision and by the provisions related to the sales targets.

43.     That putative termination was not authorized under the Agreement for multiple reasons.

44.     *First*, the Change of Control Provision clearly applies to a "change of control" of the other party, thus protecting the *non-changing party* from the possibility that it will unexpectedly be in an agreement with a party it never anticipated being in contract with.  The language does not say "the purchasing party after a sale can terminate".  Interpreting the provision the way Defendants claim, to allow GG to terminate for a change of control of GG, would create multiple impossibilities in the paragraph.  As one example, it would mean that the party that sold its rights under the contract could terminate the contract after the sale.  As another example, it would mean that a party could terminate the contract if it were in bankruptcy; as a matter of law, however, any such action would generally have to be taken by the trustee, not the party, and in any event would have to be approved by the court.  As yet another example, the interpretation Defendants advance would in effect allow either party to unilaterally terminate the Agreement at any time, merely by creating a "NewCo" to purchase the party's assets and using that transaction as an excuse to terminate the Agreement.  Moreover, standard English grammar provides that absent an obvious intention to do otherwise, a reference is applicable to the most recent antecedent; thus the "such party" in the Change of Control Provision references are to the "other party", which is the party in bankruptcy, assigning its assets, etc.

45.     *Second*, the sales target provision cannot be used as a basis for termination because any failure to meet those targets is excused by the Force Majeure Provision, which

13

explicitly excuses noncompliance by TWSS with the sales targets because of (*inter alia*) the practical unavailability of transportation and the unexpected issues with labor, materials, and manufacturing facilities in China.

46.    *Third*, the sales target provision cannot be used as a basis for termination because GG explicitly and repeatedly dismissed TWSS's concerns regarding sales targets for 2021 and requested that TWSS take steps that would better enhance the brand value, and confirmed that there was no need to worry about sales levels under the circumstances.

47.    In addition to the examples set out above, a good example of this is the communications related to the game *Gutterhead*. *Gutterhead* was one of the titles that was difficult to sell in the United States because of different cultural expectations regarding salacious content. GG was having difficulties with the game in the U.K. as well, and suggested making the game content even more salacious as a sales tactic in the U.K. TWSS agreed to that plan, notwithstanding that it would make North America sales even more difficult, with Mr. Walton appreciating that concession and stating that it was fine for TWSS to give up on meeting the original original North American sales expectations for *Gutterhead*. The overall approach by the parties is reflected in a July 8, 2021 communication from GG to TWSS: "I get that you are running out of options for GH [Gutterhead]. We are too. We just had ads shut off again and it's not looking overly positive on getting them reactivated, however, the root cause is that we're selling a '17+ adult party game intended to shock and containing adult humour' (paraphrasing Amazon's reasoning). This won't be remedied by a design change. I think at some stage we need to accept no Amazon PPC and focus on where the value is, such as pushing Beat That!, Bach, and Trunk of Drunk which all still have huge uncapped potential."

48.    *Fourth*, the sales target-related termination provisions permit termination only if TWSS is unable to demonstrate "reasonable sales uplift" within 90 days after the notice of termination. TWSS could have made that showing if permitted to do so. Indeed, the numerical "All Products" sales target for 2022 is 60,000, and TWSS in fact had *already* achieved that level of sales in April 2022, even without the benefit of the holiday season. Further, TWSS

had additional potential customers who were interested or already on board that would have significantly increased 2022 sales; those opportunities, including at least one order of 19,000 units, are now lost because of GG and Perch's wrongful conduct.

49.     On February 22, 2022, counsel for TWSS responded to Perch's letter with detailed correspondence setting out the reasons that the putative termination was not authorized. Counsel for GG responded in correspondence dated March 3, stating that GG would not continue to perform under the Agreement, notwithstanding that the letter did not provide any plausible response to the points made in TWSS's February 22 correspondence.

50.     Discussions between Perch's/GG's counsel and TWSS's counsel since that time have confirmed that GG and Perch will continue to pursue the improper termination of the Agreement and continue to refuse to accept their obligations under the Agreement, effectively repudiating and breaching the Agreement while making it impossible for Plaintiff to continue under and receive the benefits of the Agreement.

## First Cause of Action – Breach of Contract

51.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

52.     The Agreement is a valid written contract, properly executed by Plaintiff and GG.

53.     Plaintiff has fulfilled all of its obligations under the Agreement, other than those (if any) that it was excused from performing.

54.     GG and/or Perch breached the Agreement, as detailed above, by improperly refusing to comply with their obligations under the Agreement (and also by improperly announcing their intention to refuse to comply with their future obligations under the Agreement), thus preventing TWSS from obtaining its benefits under the Agreement.

55.     As a consequence of Defendants' breaches of the Agreement, Plaintiff has suffered damages in an amount to be proven at trial, reasonably estimated to exceed $35 million.

## Second Cause of Action – Anticipatory Breach of Contract

56.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

57.     The Agreement is a valid written contract, properly executed by Plaintiff and GG.

58.     Plaintiff has fulfilled all of its obligations under the Agreement, other than those (if any) that it was excused from performing.

59.     GG and/or Perch anticipatorily breached the Agreement, as detailed above, by improperly refusing to comply with their obligations under the Agreement (and also by improperly announcing their intention to refuse to comply with their future obligations under the Agreement), thus preventing TWSS from obtaining its benefits under the Agreement.

60.     As a consequence of Defendants' anticipatory breach of the Agreement, Plaintiff has suffered damages in an amount to be proven at trial, reasonably estimated to exceed $35 million.

### Third Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing

61.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

62.     As part of their obligations under the Agreement and in light of the consideration accepted from Plaintiff, GG and Perch agreed to act in good faith and to deal fairly with Plaintiff in connection with both parties receiving the benefits of the Agreement.

63.     GG and Perch nevertheless refused and failed to act in good faith and deal fairly with Plaintiff, and breached those obligations to Plaintiff, including without limitation by acting to further their own economic interest at the expense of Plaintiff, by attempting to assert technicalities (and technicalities that do not even apply, to boot) to justify their attempt to terminate the Agreement and their refusal to comply with their obligations under the Agreement, and by falsely representing to TWSS that there was no threat to the parties' relationship or the Agreement during both the period that they were in the process of selling GG to Perch and were aware that as a central part of that transaction Perch intended to attempt to terminate the Agreement pursuant to the Change of Control Provision and the period after the acquisition when TWSS was specifically seeking reassurance (rightfully so) that Perch would not terminate the Agreement.

16

64.    As a consequence of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be proven at trial, reasonably estimated to exceed $35 million.

## **PRAYER**

Wherefore, Plaintiff prays judgment against Defendants as follows:

1.    for compensatory damages in an amount to be determined at trial;

2.    for prejudgment interest as permitted by law;

3.    for postjudgment interest as permitted by law;

4.    for costs of suit, including reasonable attorneys fees; and

5.    for such other relief as the Court may deem proper.

Respectfully submitted,

Dated:  May 20, 2022

s/  Richard J. Mooney
Richard J. Mooney (*pro hac vice* anticipated)
richard.mooney@rjmlitigation.com
**RJM Litigation Group**
505 Montgomery St. #1100
San Francisco, CA 94111
Telephone:   (415) 874-3711

*Attorneys for Plaintiff That's What She Said, Inc.*

## **Demand for Jury Trial**

Plaintiff requests a trial by jury for all issues in this action triable to a jury.

Respectfully submitted,

Dated:  May 20, 2022

*s/  Richard J. Mooney*_____
Richard J. Mooney (*pro hac vice* anticipated)
richard.mooney@rjmlitigation.com
**RJM Litigation Group**
505 Montgomery St. #1100
San Francisco, CA 94111
Telephone:   (415) 874-3711

*Attorneys for Plaintiff That's What She Said, Inc.*

## GUTTER GAMES - THAT'S WHAT SHE SAID
## BRAND/PRODUCT LICENSE AGREEMENT

THIS BRAND/PRODUCT LICENSE AGREEMENT (the "Agreement") is made and entered into by and between Gutter Games Ltd., a United Kingdom limited liability company ("Licensor"), and That's What She Said, Inc., a Delaware corporation ("TWSS"), as of September 12, 2019 (the "Effective Date").

WHEREAS, Licensor is the owner of the name and mark GUTTER GAMES and the Brand Content (as defined below) associated with the games listed in *Schedule A* attached hereto, as such Schedule A may be modified from time to time in accordance with this Agreement (the "Games");

WHEREAS, the parties desire that Licensor grant TWSS an exclusive license to use the Brand Content to manufacture, make, sell, distribute, promote and market the Games in the United States and Canada, on the terms and conditions provided in this Agreement; and

NOW, THEREFORE, the parties agree as follows:

1. **License Grant.**

   (a) During the term of this Agreement as defined in Section 9(a) hereof (the "Term") and subject to the terms and conditions of this Agreement, Licensor hereby grants TWSS an exclusive (subject to Section 6(b)(iii) and 6(c)(iv) hereof), non-transferable, limited license to use the names, logos, artwork, product images, tag lines, descriptors, designs, artwork, themes, pictorial and written graphics, typography, color palettes, domain names, and other intellectual property in or associated with the Games and all copyrights, trademarks, service marks, trade dress and other intellectual, literary, artistic, design, industrial or commercial property rights therein and thereto (the "Brand Content") to manufacture, make, sell, distribute, promote and market the Games (as manufactured by or on behalf of TWSS, the "Products") in the United States and Canada (the "Territory").

   (b) During the Term, TWSS has the exclusive right to use the Brand Content within the Territory and to manufacture, make, sell, distribute, promote, market and otherwise exploit the Games within the Territory. Licensor shall not, and shall not appoint, grant the right to, authorize or permit any third party to, (i) manufacture, make, sell, distribute, promote, market or otherwise exploit the Games within the Territory or (ii) otherwise use the Brand Content in the Territory for any purpose, as except as expressly approved in writing by TWSS in its sole discretion. Notwithstanding the foregoing, Kate Walton and Zak Walton may give in-person interviews, participate in live presentations or otherwise engage in live, personal promotion of the Games within the Territory. For the avoidance of doubt, (A) Licensor will not be deemed to be in breach of its obligations in this Section as a result of the use of the Brand Content by third parties in the Territory or the manufacture, sale, distribution, marketing or promotion of the Games (or counterfeit Games) by third parties in the

*ZW*

*DM*

Territory, provided that Licensor has not appointed, authorized or permitted such third party to do so; and (B) nothing in this Agreement shall be construed as prohibiting Licensor from granting exclusive or non-exclusive rights to manufacture, make, sell, distribute, promote, market or otherwise exploit the Games outside of the Territory (or, inside of the Territory, other Licensor products that are not Games), or prohibiting Licensor or any third party from using all or some of the Brand Content outside of the Territory (or, inside the Territory, with respect to other Licensor products that are not Games). The exclusivity granted to TWSS in this Section 1 is subject to the terms and conditions of Section 6(b)(iii) and 6(c)(iv) hereof.

(c)     Licensor does not grant to TWSS, and nothing in this Agreement shall be construed as granting to TWSS, the right to sublicense or grant usage rights for the Brand Content to any third party in the Territory, other than TWSS's manufacturers, distributors, resellers, marketing/promotion service providers and other third parties contracted by TWSS to provide services to TWSS related to the Products. TWSS shall not sell the Products to any distributor or reseller that TWSS knows or reasonably ought to know intends to resell the Products outside of the Territory.

2.    **Additional Games.** If at any time during the Term Licensor intends to begin selling any game or other product that is not included in the Games listed on Schedule A (an "Additional Game"), then Licensor shall provide written notices to TWSS of Licensor's intent to sell such Additional Game and the anticipated launch date for such Additional Game. If the parties mutually agree that an Additional Game will be subject to this Agreement, then the parties shall execute an amendment to this Agreement addressing such Additional Game. Notwithstanding the foregoing, Licensor agrees that it shall not refuse to execute such an amendment to add as an Additional Game any Game that is an expansion or separate edition of an existing Game.

3.    **Quality Control.**

(a)    TWSS shall use the Brand Content solely in connection with manufacture, sale, distribution, promotion and marketing of the Products. Except as expressly provided in this Section 3, TWSS shall have the right to manufacture, make, sell, distribute, promote and market the Products using such service providers, channels of distribution, methods and media as TWSS elects in its sole discretion; provided, however, that TWSS shall use reasonable and good faith efforts to seek and consider Licensor's input where appropriate. TWSS shall use reasonable efforts to not damage Licensor's business reputation; provided that, for the purposes of this provision, Licensor acknowledges that Licensor's reputation should be considered in the context of adult-themed games with explicit content.

(b)    TWSS's use of the Brand Content shall be in accordance with applicable law and any trademark usage guidelines that Licensor provides in writing to TWSS.

(c)    TWSS shall not modify the Brand Content (including the designs and specifications of the Games) without the prior express written approval of Licensor, which approval may be granted or denied in Licensor's sole discretion.  For the avoidance of doubt,

2

ZW

DM

TWSS may resize elements of the Brand Content so long as such resizing does not change the proportions or other substantive appearance of such Brand Content.

(d)  To manufacture the Products, TWSS shall use only the manufacturers listed in **Schedule B** attached hereto (as Schedule B may be updated from time to time by mutual written agreement of the parties) or such other manufacturer as may be approved by Licensor (which approval shall not be unreasonably withheld or delayed). TWSS shall copy Licensor on relevant correspondence with its manufacturer relating to major decisions for the Products.

(e)  Licensor shall have the right to inspect the Products to confirm TWSS's compliance with this Section.

(f)  TWSS shall not be required to apply to the Products any change to Game design or other Brand Content that has not been approved by TWSS in its sole discretion.

4.  **Ownership.**

(a)  TWSS acknowledges and agrees that the Brand Content is the exclusive property of Licensor and that any and all goodwill and other proprietary rights that are created by or that result from use of the Brand Content by or on behalf of TWSS inure solely to the benefit of Licensor. TWSS shall not represent that it owns the Brand Content or any part or component of the Brand Content.

(b)  TWSS shall not take or aid in taking any action (i) to contest the validity or ownership of any Brand Content or (ii) in derogation of Licensor's rights in and to the Brand Content, including, without limitation, registering or applying to register the Brand Content or any trademark, trade name, trade dress or other designation that is confusingly similar to the trademarks, trade names, trade dress or other designations of the Games.

(c)  Upon written request by Licensor, TWSS shall use commercially reasonable efforts to assist Licensor, at Licensor's expense, in protecting Licensor's rights in and to the Brand Content within the Territory; provided, however, that this provision shall not be interpreted to require TWSS to monitor any third-party use of Brand Content. If TWSS becomes aware of an infringement of Licensor's right in the Brand Content, TWSS shall promptly notify Licensor.

5.  **Compensation.**

(a)  Royalty.

(i)  In consideration of the exclusive grant of rights to TWSS set forth in Section 1, TWSS shall pay Licensor a royalty of 8% (the "Royalty") of Gross Revenue (as defined below) from the sale of each Product.

ZW

DM

(ii)    For purposes of calculating the Royalty, "<u>Gross Revenue</u>" means: (A) for sales made to distributors or other wholesale purchasers, the gross wholesale price at which TWSS sells the Product, subject to the last sentence of this subsection (a) (ii); (B) for retail sales made directly to consumers (other than sales made through an Amazon.com store as a Seller), the gross retail price at which TWSS sells the Product; and (C) for sales made through an Amazon.com store as a Seller, the gross retail price at which TWSS sells the Product, minus all applicable fees charged by Amazon.com for that quarter (including, if and as applicable, Fulfilled by Amazon (FBA) fees, referral fees, per-item fees and variable closing fees) (collectively, "<u>Amazon Fees</u>"); provided that, for purposes of this clause (C), the average of each type of fee charged by Amazon.com to TWSS during a calendar quarter for sales of a Product will be deemed to be amount of the fee of that type applicable to all sales of such Product through Amazon.com during such quarter. Gross Revenue does not include shipping costs or other costs other than the purchase price. If TWSS provides a short-term discount on wholesale price to a retailer customer (e.g., Target), then for purposes of calculating the Royalty for such Products, Gross Revenue means the discounted wholesale price at which TWSS sells the Product to such retailer customer minus one-half of the dollar amount of the discount given to such retailer customer. For purposes of this provision, a "short-term discount" means a discount given for a purchase of a defined number of units or a defined period of short duration, generally on a single purchase order.

(iii)   TWSS shall pay the Royalty by the last day of the calendar month following the end of each calendar quarter, for Gross Revenue received by TWSS during such quarter. Royalty amounts are payable in USD via ACH payment or wire transfer to the bank account designated by Licensor. Accompanying each Royalty payment, TWSS shall provide (A) a list of the sales of Products for which TWSS received Gross Revenue during such quarter and the amount received for each such sale; and (B) for Amazon.com sales, the Amazon Fees applicable for such quarter. For the avoidance of doubt, Royalties shall not be due for any Product sale until, only if and only to the extent that Gross Revenue for such sale has actually been received by TWSS.

(iv)    If a third party that purchased Products from TWSS has the right to return unsold Products to TWSS (i.e., a return right or take-back right) and such purchaser returns Products, then (i) no Royalty shall be payable for the returned Products; and (ii) if TWSS has already paid the Royalty to Licensor for the returned Products, then TWSS will recover the amount of the Royalty payable for the returned Products (the "<u>Returned Product Royalty Amount</u>") by deducting the Returned Product Royalty Amount from the next Royalty payment(s). If any Returned Product Royalty Amount remains unrecovered as of the date of termination or expiration of this Agreement, then TWSS will invoice Licensor for the remaining amount and Licensor shall pay such amount within fifteen (15) days.

ZW

DM

(b)    TWSS shall not participate in any Amazon.com programs (other than FBA) that would reduce the Royalty received by Licensor, except with Licensor's approval (which approval shall not unreasonably be withheld or delayed).

(c)    TWSS shall not create a subsidiary or other entity controlling or controlled by TWSS to act as a distributor or retailer of TWSS for purposes of avoiding the payment of Royalties due under this Agreement.

6.    **Sales Targets.**

(a)    TWSS shall use commercially reasonable efforts to meet the applicable minimum sales targets for the Products set forth in ***Schedule C*** attached hereto (the "Sales Targets"). This obligation is subject to Sections 6(b)(iii) and 6(c)(iv) of this Agreement.

(b)    If TWSS meets the "All Products" Sales Target for the applicable year but fails to meet the applicable Sales Target for such year for one or more individual Products (each, an "Underperforming Product"), then:

    (i)    Licensor may waive its rights to make any changes to this Agreement with respect to TWSS's failure to meet the Sales Target for one or all of the Underperforming Product(s) for those years. Any such waiver shall not be deemed to be a waiver of Licensor's rights and remedies for any failure to meet applicable Sales Targets for any future year; or

    (ii)    Licensor may elect to remove any or all of such Underperforming Products from this Agreement (i.e., the Underperforming Products shall no longer be Games subject to this Agreement). Upon the effective date of any election under this subsection (b)(ii), all rights and obligations of TWSS with respect to the Underperforming Product(s) subject to the election shall cease, except as provided in Section 9(g) hereof; or

    (iii)    Licensor may elect to remove any or all of such Underperforming Products from the exclusive rights granted to TWSS, with TWSS continuing as a non-exclusive manufacturer, distributor, seller and promotor for the Underperforming Product(s) in the Territory. Upon the effective date of any election under this subsection (b)(iii), then with respect to the Underperforming Product(s) subject to the election, (A) TWSS's exclusivity rights under Section 1(b) of this Agreement shall cease, and at Licensor's election, Licensor may appoint another manufacturer, distributor, seller and promotor for such Underperforming Product(s) in the Territory; and (B) all obligations of TWSS under Section 6(a) with respect to such Underperforming Product(s) shall cease.

ZW

DM

(c)    If TWSS fails to meet the "All Products" Sales Target for the applicable year, then:

    (i)    Licensor may waive its rights to make any changes to this Agreement with respect to TWSS's failure to meet such Sales Target for those years. Any such waiver shall not be deemed to be a waiver of Licensor's rights and remedies for any failure to meet any applicable Sales Targets for any future year; or

    (ii)    Licensor may elect to terminate this Agreement. Subject to subsection (d), such election shall be effective three (3) months after the date of Licensor's written notification of its election of this option (c)(ii); or

    (iii)    Licensor may elect to remove any or all Underperforming Products from this Agreement (i.e., the Underperforming Products shall no longer be Games subject to this Agreement). Upon the effective date of any election under this subsection (c)(iii), all rights and obligations of TWSS with respect to the Underperforming Product(s) subject to the election shall cease, except as provided in Section 9(g) hereof; or

    (iv)    Licensor may elect to remove any or all Underperforming Products from the exclusive rights granted to TWSS, with TWSS continuing as a non-exclusive manufacturer, distributor, seller and promotor for the Underperforming Product(s) in the Territory. Upon the effective date of any election under this subsection (c)(iv), then with respect to the Underperforming Product(s) subject to the election, (A) TWSS's exclusivity rights under Section 1(b) of this Agreement shall cease, and at Licensor's election, Licensor may appoint another manufacturer, distributor, seller and promotor for such Underperforming Product(s) in the Territory; and (B) all obligations of TWSS under Section 6(a) with respect to such Underperforming Product(s) shall cease.

(d)    Any election under subsections (b)(ii), (b)(iii), (c)(ii), (c)(iii) or (c)(iv) of this Section 6 is subject to the following conditions:

    (i)    Licensor must provide written notice to TWSS of such election no later than three (3) months after the end of the applicable measurement period. If Licensor does not provide TWSS with written notice of such election by such deadline, then Licensor shall be deemed to have elected the waiver described in subsection (b)(i) or (c)(i) (as the case may be).

    (ii)    Sales Uplift Cure Period.

        A.    If Licensor provides written notice to TWSS of such election, TWSS shall have a period of three (3) months from the date of notice to achieve reasonable sales uplift for the Underperforming Product(s); provided that no more than 25% of such sales uplift may come from sales for which TWSS gives a discount from its then-current sales price that has not been approved by Licensor (which approval shall not unreasonably withheld or delayed). If, at the end of such three (3)-month period TWSS provides

reasonable evidence that sales for the Underperforming Product(s) are expected to meet the applicable Sales Targets for the Term Year just beginning, and Licensor (acting reasonably and in good faith) agrees in writing with such evidence, then Licensor's election under such subsection shall be cancelled and Licensor shall be deemed to have elected the waiver described in subsection (b)(i) or (c)(i) with respect to the Underperforming Product(s) for the measurement period just ended. If, at the end of such three (3)-month period TWSS cannot provide reasonable evidence that sales for the Underperforming Product(s) are expected to meet the applicable Sales Targets for the Term Year just beginning, then Licensor's election will become immediately effective.

B.     Notwithstanding the foregoing, TWSS will not receive a sales uplift cure period for an Underperforming Product if the sales uplift cure period was used for such Underperforming Product in the immediately preceding year. If TWSS relied on the sales uplift cure period for an Underperforming Product in the immediately preceding year, then Licensor's election under subsection (b)(ii), (b)(iii), (c)(ii), (c)(iii) or (c)(iv) with respect to such Underperforming Product will become effective three (3) months after the date of Licensor's written notice of its election.

(e)     Provided that TWSS uses commercially reasonable efforts to meet the Sales Targets as required by this Agreement, this Section 6 sets forth Licensor's sole and exclusive remedies for any failure of TWSS to meet any Sales Target(s).

7.     **Information and Audit Rights.**

(a)     By the last day of the calendar month following the end of each calendar quarter of the Term, TWSS shall provide Licensor with the following data for the quarter just ended: (i) calculations of Royalty payable for such quarter; (ii) units sold and gross sale dollars for the sale of Products by TWSS, broken down by wholesale (by customer), direct-to-consumer retail on TWSS-owned websites, and direct-to-consumer retail on Amazon.com; (iii) if and as available, units sold and gross sale dollars for the sale of Products by TWSS's wholesale retailer customers (e.g., Target); (iv) data on advertising reach and engagement; (v) TWSS's then-current inventory levels for the Products; and (vi) estimates of inventory levels for distributors and other wholesale customers.

(b)     During the Term, TWSS shall maintain accurate books and records (collectively, "Records") relating to manufacturing, marketing and sales of the Products. During the Term and for six (6) months thereafter, Licensor and/or its designated auditors shall have the right to reasonable inspection of the Records, upon reasonable prior notice (but no less than three (3) business days) and no more often than once in any twelve (12)-month period, with such inspection to take place via email or other remote exchange or, if agreed by the parties, in TWSS's main corporate office. Any Records or any other information derived from such inspection shall be Confidential Information of TWSS subject to Section 8 of this Agreement. In the event any such

ZW

DM

inspection of the Records reveals any underpayment of Royalty, (i) TWSS shall pay such amount within fifteen (15) days and (ii) during the twelve (12)-month period following such inspection, Licensor will have the right to inspect the Records twice instead of only once.

(c)   TWSS shall provide Licensor with view-only access to all seller account(s) used to sell Products on Amazon.com.

(d)   Each party shall, using reasonable efforts and good faith, share and discuss lessons learned and best practices with respect to the Products and the Games.

8.   **Confidentiality**.

(a)   "Confidential Information" means nonpublic information, data or know-how that the disclosing party ("Disclosing Party") designates as being confidential to the receiving party ("Receiving Party"), or that, based on the nature of the information or under the circumstances surrounding disclosure or receipt, reasonably ought to be treated as confidential by the Receiving Party. Confidential Information includes, without limitation, the terms of this Agreement; inventory and sales data, product development plans, and financial, accounting, and business performance information; and information received from third parties that Disclosing Party is obligated to treat as confidential. Confidential Information does not include information that (i) is or subsequently becomes generally available to the public other than by a breach of a confidentiality obligation; (ii) is already in the possession of Receiving Party prior to Disclosing Party's disclosure to Receiving Party; (iii) is independently developed by Receiving Party without use of or reference to the Disclosing Party's Confidential Information; or (iv) becomes available to Receiving Party from a source other than the Disclosing Party other than by a breach of a confidentiality obligation.

(b)   During the Term and thereafter, Receiving Party shall (i) to take reasonable security precautions, at least those precautions it takes to protect its own Confidential Information of a similar nature but no less than reasonable care, to keep the Confidential Information of Disclosing Party confidential and not to disclose Confidential Information of Disclosing Party to any party other than its employees, consultants, advisors, agents and representatives ("Representatives") who need to know and who are bound by obligations of confidentiality and limited use covering such Confidential Information at least as stringent as those of this Section, (ii) to use the Confidential Information of Disclosing Party only for the purpose of performing Receiving Party's obligations or enforcing its rights under the Agreement, and (iii) to not modify, reverse engineer, decompile, disassemble, or create derivative or other works based on or containing Confidential Information of Disclosing Party, except as expressly permitted by the Agreement. Notwithstanding the foregoing, Receiving Party may disclose Confidential Information of Disclosing Party pursuant to a validly issued court order or subpoena so long as Receiving Party (A) provides to Disclosing Party prompt written notice of any such court order or subpoena for the purpose of enabling Disclosing Party to seek a protective order or otherwise prevent or restrict such disclosure and (B) discloses only the Confidential Information that is legally

required to be disclosed. Receiving Party shall immediately notify Disclosing Party upon discovery of any unauthorized use or disclosure of Confidential Information and shall cooperate with Disclosing Party to regain possession of the Confidential Information and prevent its further unauthorized use. Receiving Party shall be responsible for any breaches of this Section by its Representatives.

(c) At Disclosing Party's request, Receiving Party shall promptly return to Disclosing Party all of Disclosing Party's Confidential Information or destroy the same and shall provide Disclosing Party with written confirmation from an officer of Receiving Party of such occurrence (other than any such Confidential Information that the Receiving Party is required to retain by law or for legal, regulatory or accounting purposes, or that the Receiving Party retains in its backup or archival records, which Confidential Information shall continue to be subject to the obligations of this Section for so long as it is retained).

(d) Each party retains all right, title and interest in and to its Confidential Information. Disclosure of Confidential Information to Receiving Party does not grant any express or implied right under any patents, copyrights, trademarks, trade secret information or other intellectual property right of Disclosing Party, except as expressly set forth in the Agreement.

(e) Any breach by Receiving Party of its obligations under this Section may cause the Disclosing Party significant injury for which there are inadequate remedies at law. Accordingly, Disclosing Party shall be entitled to seek equitable relief to enjoin any such breach or threatened breach without the necessity of posting a bond, in addition to all other rights and remedies that it may have under this Agreement, at law or otherwise.

9. **Term and Termination**.

(a) The initial term of this Agreement shall commence on the Effective Date and end on December 31, 2027 (the "Initial Term"), unless this Agreement is earlier terminated in accordance with this Section. Thereafter, this Agreement shall automatically renew for successive renewal terms of one (1) year each, unless earlier terminated in accordance with this Section. The Initial Term and any renewal term(s) are referred to individually and collectively as the "Term."

(b) Effective at any time after the date that is two (2) years after the Effective Date, TWSS may terminate this Agreement for any reason upon six (6) months' prior written notice to Licensor.

(c) Effective at any time after the date that is fourteen (14) years after the Effective Date, Licensor may terminate this Agreement for any reason upon six (6) months' prior written notice to Licensor.

(d) Licensor shall have the termination right provided in Sections 6(b) and 6(c) in connection with certain failures by TWSS to meet Sales Targets for the Products.

9

(e)  Either party may terminate this Agreement upon written notice to the other party if the other party breaches any material provision of this Agreement and does not cure such breach within thirty (30) days after the receipt of written notice of such breach.

(f)  A party may terminate this Agreement upon written notice to the other party if (i) insolvency, bankruptcy or similar proceedings are instituted by or against such party, (ii) there is any assignment or attempted assignment by such party for the benefit of creditors, (iii) there is any appointment, or application of such appointment of a receiver for such party; or (iv) there is a sale or transfer of all or substantially all of the assets, or a merger or consolidation of such party, or a transfer of ownership that results in a change of voting control of such party.

(g)  Upon termination or expiration of this Agreement for any reason:

(i)  all rights to the Brand Content will cease and all revert to Licensor, except that TWSS will temporarily retain such rights to the Brand Content as are necessary for TWSS to exercise its rights under subsection (g)(vi) of this Section;

(ii)  upon request of the other party, each party shall promptly return to the other party all Confidential Information (as defined below) of the other party in its possession or control (other than any such Confidential Information that the such party is required to retain by law or for legal, regulatory or accounting purposes, or that such party retains in its backup or archival records, which Confidential Information shall continue to be subject to the obligations of Section 8 for so long as it is retained), and upon request, shall provide the other party with a certification of the return of all such Confidential Information;

(iii)  TWSS and its distributors, resellers and service providers shall cease using the Brand Content, except to sell the remaining inventory of Products pursuant to subsection (g)(vi) of this Section;

(iv)  TWSS shall return to Licensor all tangible and electronic expressions of Brand Content that was created or provided by Licensor to TWSS; provided, however, that this provision shall not require TWSS to deliver to Licensor any tangible or electronic works (such as videos) that were created by TWSS containing Brand Content.

(v)  Sections 4(a)-(b), 7(b), 8, 9(g)(v), 10(d), 11, 12, 13, and 15 through 20, the last sentence of Section 21, and all payment obligations incurred before termination or under subsection (g)(vi) of this Section after termination, shall survive termination of this Agreement; and

(vi)  for a period of six (6) months following the termination of this Agreement, TWSS and its distributors and resellers shall have the right to sell their remaining inventory of Products, provided that (i) TWSS shall pay Licensor the Royalty for all such post-termination Product sales; and (ii) in selling its

10

remaining inventory of Products, TWSS shall not sell the Products to distributors or other non-retailer wholesale purchasers for more than 15% below its then-current wholesale price and shall not sell the Products to consumers through Amazon.com or to retailer customers (e.g., Target) for more than 10% below its then-current price for consumers or retail customers (as the case may be). This right to sell remaining inventory shall also apply to Underperforming Product(s) subject to an election under Section 6(b)(ii) or 6(c)(iii).

(vii) Licensor shall have the right, but not the obligation, to purchase from TWSS some or all of TWSS's remaining inventory of Products, for a purchase price equal to the price paid by TWSS for such Products. For purposes of this provision, the price paid by TWSS for such Products includes all costs paid or payable by TWSS in connection with the manufacture and testing of the Products and shipment of such Products to TWSS's delivery location(s), including but not limited to manufacturing fees, lab costs for requirement tests, origin freight charges, shipping costs to the port of entry, customs examination fees, customs duties, freight and delivery costs to final destination, and insurance (to the extent not included in freight and shipping charges). If Licensor purchases Products from TWSS, Licensor shall pay all costs associated with the delivery of the purchased Products to Licensor's delivery location(s).

10. **Representations and Warranties.**

(a) Each party represents and warrants to the other party that (i) it has full right and authority to enter into this Agreement; (ii) it has taken all corporate and other actions necessary to enter into and deliver this Agreement and to perform its obligations hereunder; (iii) there is no outstanding commitment, agreement or legal impediment of any kind known to such party that conflicts with this Agreement or might limit, restrict or impair the ability of such party to perform its obligations hereunder; and (iv) its performance hereunder shall not violate any applicable law, regulation or order.

(b) Licensor further represents and warrants that, to its knowledge, (i) Licensor is the owner of all right, title and interest in and to the Brand Content; and (ii) Licensor has all necessary rights to grant to TWSS the rights granted to TWSS under this Agreement, free of any encumbrances; and (iii) neither the Brand Content nor the grant to TWSS of the rights granted to TWSS under this Agreement infringes or will infringe on any intellectual property or other rights of any third party.

(c) TWSS further represents and warrants that the Products will be manufactured in accordance with (i) applicable laws and regulations and generally accepted industry standards; and (ii) any trademark usage guidelines for the Brand Content provided to TWSS by Licensor in writing.

(d) EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY

11

WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY WARRANTY REGARDING SALES, PROFITS OR ROYALTIES TO BE ACHIEVED, AND EACH PARTY DISCLAIMS ALL SUCH WARRANTIES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

11. **Indemnification**.

(a) Each party (the "indemnifying party") shall indemnify, defend and hold harmless the other party (the "indemnified party") from and against any losses, liability, damages, cost or expense (including without limitation reasonable attorneys' fees and costs) ("Losses") incurred by the indemnified party as a result of any claim, action or proceeding by a third party (a "claim") based on, arising out of or alleging (i) a breach by the indemnifying party of any of its express obligations, representations or warranties under this Agreement; and (ii) the gross negligence or intentional misconduct of the indemnifying party.

(b) In addition, Licensor shall indemnify, defend and hold TWSS harmless from and against any Losses incurred by TWSS as a result of any claim that the Brand Content or the grant to TWSS of the rights granted to TWSS under this Agreement infringes on or violates any intellectual property or other rights of any third party..

(c) The indemnifying party's indemnity obligations set forth above are subject to the following procedure: (i) the indemnified party shall promptly notify the indemnifying party in writing of the claim, provided that the failure of the indemnified party to so notify will not relieve the indemnifying party of its indemnity obligations except to the extent that the failure to so notify materially prejudices the indemnifying party's ability to defend such claim; (ii) the indemnifying party will have sole control of the defense and all related settlement negotiations, provided that the indemnified party may participate in the defense and settlement negotiations using its own counsel at its own expense and provided further that the indemnifying party shall not resolve or settle any claim without the indemnified party's consent unless the resolution or settlement provides for an unconditional release of the indemnified party from all liability with respect to such claim, does not commit the indemnified party to make any monetary payment or any other obligation, and admits no fault by the indemnified party; and (iii) the indemnified party, at the indemnifying party's expense, shall reasonably cooperate with the indemnifying party in the defense and settlement.

(d) TWSS may offset or deduct from future Royalty payments any amounts payable by Licensor under this Section 11.

12. **Independent Contractors.** The relationship of Licensor and TWSS is that of independent contractors, and nothing contained in this Agreement shall constitute or be construed to constitute the parties as partners, joint venturers, co-owners, principal and agent, or any

ZW

DM

relationship other than independent contractors. Neither Licensor nor TWSS is authorized to act on behalf of or create or assume obligations on behalf of the other and neither shall represent to third parties that it is an agent, representative or partner of the other.

13. **Limitation of Liability.** EXCEPT WITH RESPECT TO A PARTY'S INDEMNIFICATION OBLIGATIONS AND BREACHES OF ITS CONFIDENTIALITY OBLIGATIONS, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOSS OF GOODWILL OR LOST PROFITS OR REVENUE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF SUCH DAMAGES ARE REASONABLY FORESEEABLE, WHETHER SUCH LIABILITY IS BASED ON CONTRACT, TORT, WARRANTY, OR ANY OTHER LEGAL OR EQUITABLE GROUNDS. SUCH LIMITATIONS WILL APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

14. **Force Majeure.** Neither party shall be liable for any failure or delay of performance due to any cause beyond its reasonable control, including, without limitation, any act of God, governmental act, fire, strike, labor slowdown, war, riot, terrorism, delays in transportation not within a party's reasonable control, or inability to obtain necessary labor, materials or manufacturing facilities.

15. **Notices; Approvals and Mutual Agreements of the Parties.** Any notices, consents or other communications required to be given under this Agreement shall be in writing and will be deemed given (a) five (5) business days after being deposited with a reputable international courier; or (b) upon confirmation of receipt if sent by confirmed email. An email will be deemed to be confirmed upon written acknowledgement from the recipient (such as by the "return receipt requested" function, a return email, or other written acknowledgment). Notice shall be provided to a party at the address or email address provided below the signatures to this Agreement, or such other address or email address as a party may specify by written notice to the other party. When mutual agreement of the parties or approval of a party is required or contemplated under this Agreement, such agreement or approval shall be provided in writing (including by email between the business representatives of the parties only, if such mutual agreement or approval is expressly required or contemplated by this Agreement and thereby does not constitute an amendment of this Agreement).

16. **Applicable Law; Attorney's Fees.** This Agreement shall be construed in accordance with the law of the state of New York, United States, without respect to its choice of law principles. The parties disclaim application of the United Nations Convention on Contracts for the International Sale of Goods. Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in New York City, United States, and each party irrevocably consents to personal jurisdiction and venue therein and waives any claim of improper venue or inconvenient forum. In the event of a dispute arising out of or relating to this Agreement, the prevailing party shall be entitled to receive from the other party its reasonable attorneys' fees and costs.

ZW

DM

17. **Entire Agreement; Amendment and Waiver.**  This Agreement, together with its exhibits, constitutes the complete and exclusive understanding and agreement between the parties regarding its subject matter and supersedes all prior or contemporaneous agreements or understandings, whether written or oral, relating to its subject matter.  This Agreement may be amended only by a writing signed by the parties.  The failure of either party to enforce any term or condition of this Agreement shall not be deemed a waiver of the same or any other terms or conditions of this Agreement at any prior or subsequent time.

18. **Assignment.**  Neither party has the right to assign, delegate, convey, or otherwise transfer, whether voluntarily, involuntarily, or by operation of law, in whole or in part, this Agreement or its rights and obligations hereunder, without the prior written consent of the other party. Any assignment under this Section is conditioned on written agreement by the assignee party to assume all of the assigning party's rights and obligations under this Agreement. Subject to the foregoing, this Agreement will be binding upon and will inure to the benefit of the successors and assigns of the parties.

19. **Successors and Assigns; No Third-Party Beneficiaries.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their permitted successors and assigns. Nothing in this Agreement either expressed or implied is intended to confer upon any other person or entity any rights under or by reason of this Agreement.

20. **Severability.**  If for any reason a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable, (a) the validity, legality and enforceability of any of the remaining provisions of this Agreement will not in any way be affected or impaired thereby, (b) such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law, and (c) the remainder of this Agreement will remain in full force and effect.

21. **Counterparts; Execution and Delivery; Headings.** In addition to any other lawful means of execution or delivery, this Agreement may be executed by electronic, facsimile or scanned signatures and delivered by electronic transmission. The headings in this Agreement are for convenience of reference only and shall not affect its interpretation or construction.

ZW

DM

IN WITNESS HEREOF, the parties hereto have executed this Brand/Product License Agreement as of the Effective Date.

GUTTER GAMES LTD.

By _Zaee_

Print Name: _ZACHARY WALTON_

Title: _DIRECTOR_

Address:
Gutter Games Ltd.
_BARBRIDGE FARM_
_MELPLASH, BRIDPORT,_
_UNITED KINGDOM    DT6 3UH_
Email: _zak @ gutter - games . com_

THAT'S WHAT SHE SAID, INC.

By _DaMy_

Print Name: _DAN MYERS_

Title: _PRESIDENT_

Address:
That's What She Said, Inc.
2310 N 88th Street
Seattle, WA 98103
USA
Email:  legal@thatswhatshesaidgame.com

15

DM
ZW

**Schedule A**

**THE GAMES**

Gutterhead
Gutterhead Expansion Pack
Trunk of Drunk
Bachelorette Bundle
Beat That!
Destination Drunk


Within 60 days after the Effective Date, TWSS shall place an order with its manufacturer for the production of the following number of units for each Product:

Gutterhead: 5,000
Gutterhead Expansion Pack: n/a
Trunk of Drunk: 1,000
Bachelorette Bundle: 2,000
Beat That!: 10,000
Destination Drunk: 1,000

**Schedule B**

## APPROVED MANUFACTURERS

Rising Games
Longshore
SIG

17

## Schedule C

## SALES TARGETS

In Years 1-13 of the Term, there are two annual Sales Targets:
  (1) The number of units sold of each Product (other than expansion packs), and the aggregate number of units of all Products, must be equal to or greater than the applicable number set forth in the table for that year; and
  (2) The number of units sold of each Product (other than expansion packs) must be equal to 3 times the number of units of that same Game sold by Licensor in the U.K. in that year, and the aggregate number of units sold of all Products must be equal to 3 times the number of units of all Games sold by Licensor in the U.K. in that year.

If TWSS fails to meet either or both of these in a given year, then for purposes of Section 6, TWSS will be deemed to not have met the Sales Target for such Product (or for all Products, as the case may be) for that year.

There are no sales targets for expansion packs.

| TERM YEAR | MINIMUM SALES TARGETS FOR SALES BY TWSS (UNITS) | | | | | |
|---|---|---|---|---|---|---|
|  | Gutterhead | Trunk of Drunk | Bachelorette Bundle | Beat That! | Destination Drunk | All Products |
| Year 1[(1)] | 5,000 | 5,000 | 5,000 | 5,000 | 3,000 | 15,000 |
| Year 2[(2)] | 10,000 | 10,000 | 10,000 | 10,000 | 6,000 | 30,000 |
| Year 3[(2)] | 20,000 | 20,000 | 20,000 | 20,000 | 12,000 | 60,000 |
| Year 4[(2)] | 30,000 | 30,000 | 30,000 | 30,000 | 22,000 | 92,000 |
| Year 5[(2)] | 40,000 | 40,000 | 40,000 | 40,000 | 32,000 | 124,000 |
| Year 6[(2)] | 50,000 | 50,000 | 50,000 | 50,000 | 42,000 | 157,000 |
| Year 7[(2)] | 60,000 | 60,000 | 60,000 | 60,000 | 52,000 | 189,000 |
| Year 8[(2)] | 50,000 | 50,000 | 50,000 | 50,000 | 42,000 | 157,000 |
| Year 9[(2)] | 40,000 | 40,000 | 40,000 | 40,000 | 32,000 | 124,000 |
| Year 10[(2)] | 30,000 | 30,000 | 30,000 | 30,000 | 22,000 | 92,000 |
| Year 11[(2)] | 20,000 | 20,000 | 20,000 | 20,000 | 12,000 | 60,000 |
| Year 12[(2)] | 10,000 | 10,000 | 10,000 | 10,000 | 6,000 | 30,000 |
| Year 13[(2)] | 5,000 | 5,000 | 5,000 | 3,000 | 3,000 | 15,000 |
| Year 14 and thereafter:  no Sales Targets | | | | | | |

(1) Year 1 begins on the Effective Date and ends on December 31, 2020. Subsequent Term years run from January 1 to December 31.

(2) For purposes of measuring performance against Sales Targets of type 1, one-half (50%) of the number of any units sold by TWSS in a given year that is in excess of the applicable Sales Target for that year (the "Carryover") will be carried over and added to the total units actually sold by TWSS in the following year (and, as described below, future years). For the avoidance of



doubt, the Carryover will not apply to type 2 Sales Targets (i.e., the Carryover does not apply to the Sales Target of 3x UK sales).

To the extent that the Carryover for a Product is not applied to a given year's sales to make up for any shortfall in performance against the type 1 Sales Targets for that year, the unused Carryover will be carried over to the following year and, to the extent not used in that and subsequent years, to subsequent years.

If an Additional Game is added to this Agreement in accordance with Section 2, the parties may agree that such Additional Game will have Sales Targets. If so, then the Sales Targets for the Additional Game will be as agreed by the parties, and in the written amendment to the Agreement that adds such Additional Game to Schedule A, the parties shall also amend this Schedule B to replace the table above with a new table that reflects the Sales Targets for the Additional Game (including new "All Products" Sales Targets that reflect the Additional Game). Notwithstanding the foregoing, with respect to any Additional Game that is a separate edition of an existing Game, if the parties cannot agree on the Sales Targets for such Additional Game within thirty (30) days of the date of Licensor's notice regarding such Additional Game, then the Sales Targets for such Additional Game for the first thirteen (13) years of the Term following its addition to the Agreement shall be the Sales Targets that were applicable to the corresponding Game (i.e., the Game for which it is a new edition) for each of the first thirteen (13) years of the Initial Term.



