UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THAT'S WHAT SHE SAID, INC.,

           Plaintiff,

-v.-

GUTTER GAMES LTD. and PERCH UK 1 LTD,

           Defendants.[1]

22 Civ. 4230 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

    Plaintiff That's What She Said, Inc. ("TWSS" or "Plaintiff"), a Washington-based game company incorporated in Delaware, brings this action against British companies Gutter Games Ltd. ("Gutter Games") and Perch UK 1 Ltd. ("Perch," and with Gutter Games, "Defendants"), alleging breach of contract, anticipatory breach of contract, and breach of the covenant of good faith and fair dealing. Plaintiff filed the action in this District based on a mandatory forum selection clause contained in a license agreement between Plaintiff and Gutter Games.

    As relevant here, Perch has moved to dismiss all claims against it for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), reasoning that it is not bound by the forum selection clause as a non-signatory to the agreement, and for failure to state a claim under Rule 12(b)(6) for the same reason. In response, Plaintiff has requested leave to conduct jurisdictional discovery on the issue of whether Perch was in fact a successor

---

[1]     The Clerk of Court is directed to amend the caption as set forth above.

in interest to Gutter Games, thus potentially binding Perch to the terms of the license agreement. For the reasons that follow, the Court grants Plaintiff's request for jurisdictional discovery, and denies Perch's motion to dismiss without prejudice to its renewal at a later date.

## BACKGROUND[2]

### A. Factual Background

On September 12, 2019, Plaintiff, a game company incorporated in Delaware with its principal place of business in Washington, entered into a Brand/Product License Agreement (the "Agreement") with Gutter Games, another game company organized under English law with its principal place of business in the United Kingdom. (Compl. ¶¶ 1-3, 12; Agreement). The relationship between the two companies began when Gutter Games and its then-owners, Zachary and Katherine Walton (the "Waltons"), reached out to Plaintiff for assistance with expanding into the United States market. (Compl. ¶¶ 1, 10-11). As part of the Agreement, Plaintiff was given the exclusive right to "manufacture, make, sell, distribute, promote, [and] market" various Gutter Games products in the United States and Canada; in exchange, Gutter Games

---

[2]   This Opinion draws its facts primarily from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true for the purposes of this Opinion. The Court also considers: (i) the Brand/Product License Agreement (the "Agreement"), attached as an unlabeled exhibit to the Complaint; (ii) the Declaration of Dan Myers in support of Plaintiff's opposition to Perch's motion to dismiss ("Myers Decl." (Dkt. #33-1)) and the exhibits attached thereto, including the notice of termination of the Agreement ("Notice of Termination" (Dkt. #33-1)); and (iii) the Declaration of Richard Mooney in support of same ("Mooney Decl." (Dkt. #33-2)) and the exhibits attached thereto.

For ease of reference, the Court refers to Perch's memorandum of law in support of its motion to dismiss as "Perch Br." (Dkt. #32); to Plaintiff's memorandum of law in opposition to Perch's motion to dismiss as "Pl. Opp." (Dkt. #33); and to Perch's reply memorandum as "Perch Reply" (Dkt. #34).

agreed to pay Plaintiff a royalty of eight percent of gross revenues from the sale of each product in those markets. (*Id.* ¶¶ 11, 14; Agreement §§ 1(b), 5(a)(i)). The initial term of the Agreement was for eight years, unless a party terminated pursuant to certain specified termination events including, as relevant here: (i) Plaintiff's inability to meet minimum sales targets (*see* Agreement § 6(a), (c)(ii) (the "Sales Target Provision"); *see also* Compl. ¶¶ 15, 18); and/or (ii) "a sale or transfer of all or substantially all of the assets, or a merger or consolidation of such party, or a transfer of ownership that results in a change of voting control of such party" (Agreement § 9(f) (the "Change of Control Provision"); *see also* Compl. ¶ 19). The Agreement includes a New York choice of law provision and mandatory forum selection clause, which specifies that "[a]ny legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in New York City, United States, and each party irrevocably consents to personal jurisdiction[.]" (Agreement § 16).

According to Plaintiff, beginning in late 2020 and into 2021, the transportation bottleneck and various factory issues created by the COVID-19 pandemic made it impossible for Plaintiff to achieve the sales targets set out in the Agreement. (Compl. ¶¶ 27-29). Despite these difficulties, Plaintiff and Gutter Games continued to work together. (*Id.* ¶ 30). Indeed, Gutter Games reassured Plaintiff that it did not intend to terminate the Agreement and that Plaintiff should invest further in the brand, focus on opening new sales channels, turn down deals that would help Plaintiff hit sales targets but

potentially damage the long-term prospects of the brand, and conceptualize and develop new games and expansions of current games to better position Gutter Games for strong sales once the logistics and transportation issues were resolved. (*Id.*). In consequence, by the end of 2021, Plaintiff had invested approximately $10 million in the project. (*Id.* ¶ 16).

In spring 2021, the Waltons dramatically reduced their communications with Plaintiff, but still reassured Plaintiff that Gutter Games intended to continue with the Agreement. (Compl. ¶¶ 33-34). Plaintiff alleges that these reassurances were intentionally false, because by at least June 2021, Gutter Games was in discussions to sell its business to Perch. (*Id.* ¶ 35). This lulling by the Waltons, Plaintiff suggests, was part of Defendants' plan to terminate the Agreement pursuant to the Change of Control Provision, thereby reaping the benefits of Plaintiff's significant investments in developing, marketing, and selling the games, while leaving Plaintiff with neither payment nor recourse. (*Id.*).

Because Gutter Games kept its anticipated acquisition by Perch secret, Plaintiff continued to invest in the United States and Canadian markets pursuant to the terms of the Agreement. (Compl. ¶ 36). It was not until September 27, 2021, that the Waltons called Plaintiff to communicate that Gutter Games had been "bought" by Perch, with no additional information as to the precise nature of the transaction. (*Id.* ¶ 38). Plaintiff alleges that during that same call, the Waltons informed Plaintiff that "they" intended to use the Change of Control Provision at some future date to cancel the Agreement. (*Id.*).

Just a few days later, however, Plaintiff communicated the Waltons' message to a Perch representative, who informed Plaintiff that Perch had no such intention, and stated that his job was to keep everything running smoothly in the short term. (*Id.* ¶ 39).

Finally, on December 23, 2021, shortly after Plaintiff announced that it was about to make a large inventory order, Perch communicated to Plaintiff that it was considering terminating the Agreement due to Plaintiff's inability to reach the sales targets set forth in the Agreement. (Compl. ¶ 40). Plaintiff continued to perform until, on January 21, 2022, Plaintiff received a letter on Perch letterhead stating that Gutter Games was terminating the Agreement pursuant to both the Change of Control Provision and the Sales Target Provision. (*Id.* ¶ 42; Notice of Termination 1). With particular respect to the Change of Control Provision, the Notice recited that "all of the assets and outstanding ownership shares of Gutter Games … were sold to Perch … pursuant to that certain Share Purchase Agreement by and among [the Waltons] … dated as of September 23, 2021[.]" (Notice of Termination 1). The Notice directed Plaintiff to contact Jack Hartigan, an individual with a Perch email address, with any questions. (*Id.* at 2).

**B.    Procedural Background**

Plaintiff initiated this action on May 23, 2022, by filing its complaint against Gutter Games and Perch. (Dkt. #1). On July 29, 2022, Perch filed a pre-motion letter stating its intention to file a motion to dismiss the claims against it for lack of personal jurisdiction under Rule 12(b)(2) of the Federal

Rules of Civil Procedure and for failure to state a claim under Rule 12(b)(6). (Dkt. #16). Plaintiff filed its opposition to Perch's pre-motion letter on August 11, 2022. (Dkt. #18). On August 12, 2022, the Court granted Perch's request for a pre-motion conference and stated that it would discuss Perch's anticipated motion at the initial pretrial conference scheduled for September 7, 2022. (Dkt. #19). Separately, Gutter Games filed an answer and amended answer to the Complaint and a counterclaim against Plaintiff. (Dkt. #15, 20).[3]

At the conference, the Court and parties discussed Perch's anticipated motion to dismiss. Additionally, as an alternate path to resolving the case, all parties expressed an interest in appearing before a magistrate judge for a settlement conference. The Court referred this case to Magistrate Judge Stewart D. Aaron for a settlement conference on September 8, 2022, and stayed Perch's discovery obligations pending the outcome of those discussions. (*See* September 7, 2022 Minute Entry; *see also* Dkt. #23).

Upon learning that settlement efforts had failed, the Court directed the parties to file a joint letter proposing a briefing schedule for Perch's motion to dismiss, which letter was filed on November 10, 2022. (Dkt. #27). The Court then adopted the parties' proposed briefing schedule. (Dkt. #28). Perch filed its motion to dismiss and accompanying papers on December 2, 2022 (Dkt.

---

[3]  Gutter Games did not move to dismiss the claims against it and, as such, the case between Plaintiff and Gutter Games is proceeding on a separate track. Plaintiff filed an answer to Gutter Games's counterclaim (Dkt. #29), and the claims between Plaintiff and Gutter Games are currently in discovery (*see* Dkt. #47). Because the instant motion concerns only Plaintiff's claims against Perch, the Court does not recount the full procedural history of the claims between Plaintiff and Gutter Games.

#31-32); Plaintiff filed its opposition and accompanying papers on December 30, 2022 (Dkt. #33); and Perch filed its reply on January 13, 2023 (Dkt. #34).

## DISCUSSION

### A.   Standards of Review

#### 1.   Federal Rule of Civil Procedure 12(b)(2)

"On a Rule 12(b)(2) motion, plaintiff carries the burden of demonstrating that jurisdiction exists, and where the district court did not conduct a full-blown evidentiary hearing on a motion, the plaintiff need make only a *prima facie* showing of jurisdiction." *Penachio* v. *Benedict*, 461 F. App'x 4, 5 (2d Cir. 2012) (summary order) (internal quotation marks and citations omitted).  This *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Chloé* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (internal quotation marks and brackets omitted).  In determining whether a plaintiff has met this burden, a court construes all jurisdictional allegations "in the light most favorable to [the plaintiff], resolving all doubts in [its] favor," *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001), and may rely on materials outside the pleadings in doing so, *Minnie Rose LLC* v. *Yu*, 169 F. Supp. 3d 504, 510 (S.D.N.Y. 2016).  This is because, in contrast to a Rule 12(b)(6) motion, "deciding a rule 12(b)(2) motion necessarily requires resolution of factual matters outside the pleadings." *Zibiz Corp.* v. *FCN Tech. Sols.*, 777 F. Supp. 2d 408, 416 (E.D.N.Y. 2011) (internal quotation marks and citation

omitted). Nevertheless, the court need not "accept as true a legal conclusion couched as a factual allegation[.]" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks and citations omitted).

### 2. Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the operative complaint. *Id.* Additionally, the court may consider any written instrument attached to the complaint as an exhibit, any statements or documents incorporated by reference in the complaint, documents that are "integral" to the complaint even if they are not incorporated by reference, and matters of which judicial notice may be taken. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)).

### B. Analysis

"Before reaching the merits of any claims, a federal court must first determine that it has jurisdiction over the category of claim in suit (subject-

matter jurisdiction) and the parties (personal jurisdiction)." *Gentry* v. *Kaltner*, No. 17 Civ. 8654 (KMK), 2020 WL 1467358, at *6 (S.D.N.Y. Mar. 25, 2020) (internal quotation marks and citations omitted). Thus, "[c]ourts typically consider a defendant's jurisdictional motions before considering any other type of motions." *Metro-Goldwyn-Mayer Studios Inc.* v. *Canal+ Distrib. S.A.S.*, No. 07 Civ. 2918 (DAB), 2010 WL 537583, at *5 (S.D.N.Y. Feb. 9, 2010) (citation omitted). In doing so, the court has "considerable procedural leeway" and may "determine the motion on the basis of affidavits alone[,] ... may permit discovery in aid of the motion[,] or ... may conduct an evidentiary hearing on the merits of the motion." *Id.* at *5 (footnote and quotation marks omitted) (quoting *Marine Midland Bank, N.A.* v. *Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

This Court first considers whether the Agreement's forum selection clause is enforceable against Perch. The Complaint does little to establish or allege jurisdictional facts, instead broadly asserting that Perch "t[ook] control of Gutter Games"; that both Defendants colluded to avoid Gutter Games's contractual obligations; and that Plaintiff received *from Perch* notice of Gutter Games's termination of the Agreement. (Compl. ¶¶ 38-42). In its opposition to Perch's motion, Plaintiff clarifies its position, and asserts that Perch is bound to the forum selection clause by virtue of its position as a successor in interest to Gutter Games and pursuant to the "closely related" test established by the Second Circuit in *Aguas Lenders Recovery Group* v. *Suez, S.A.*, 585 F.3d 696 (2d Cir. 2009). (Pl. Opp. 6-9).

In this regard, Plaintiff attempts to separate its jurisdictional arguments into two separate theories — one of successorship and one under the closely related test. (Pl. Opp. 6-8). Because Plaintiff's factual assertions are all consistent with a successor in interest theory, and because "successors-in-interest … 'unquestionably fit within the definition of closely related[,]'" *Miller* v. *Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 524 (S.D.N.Y. 2018) (quoting *KTV Media Int'l, Inc.* v. *Galaxy Grp., LA LLC*, 812 F. Supp. 2d 377, 386 (S.D.N.Y. 2011)), *aff'd*, 774 F. App'x 714 (2d Cir. 2019) (summary order), the Court treats the successorship theory as a subset of the closely related test, and not a separate argument. The Court addresses the closely related test and Perch's broader due process argument in turn.

### 1. The Closely Related Test

The Second Circuit has long held that "the fact [that] a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause." *Aguas Lenders Recovery Grp.*, 585 F.3d at 701 (collecting cases). The "closely related" test "gives parties who have come to an agreement the ability to enforce that agreement against the universe of entities who should expect as much — successors-in-interest, executive officers, and the like — without being overly persnickety about who signed on the dotted line." *Affiliated FM Ins. Co.* v. *Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 337 (S.D.N.Y. 2018); *see also Aguas Lenders Recovery Grp.*, 585 F.3d at 701 ("[A] forum selection clause is integral to the obligations of the

overall contract, and a successor in interest should no more be able to evade it than any other obligation under the agreement.").

"Whether a party is closely related to a signatory is a fact-specific inquiry[.]" *Kasper Glob. Collection & Brokers, Inc.* v. *Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 561 (S.D.N.Y. 2013). "The vast majority of cases that have found a non-signatory bound by a forum selection clause under the theory that they are 'closely related' to the signatory or the dispute have done so where the non-signatory had an active role in the transaction between the signatories or where the non-signatory had an active role in the company that was the signatory." *Prospect Funding Holdings, LLC* v. *Vinson*, 256 F. Supp. 3d 318, 325 (S.D.N.Y. 2017) (citing *Leviton Mfg. Co.* v. *Reeve*, 942 F. Supp. 2d 244, 259 (E.D.N.Y. 2013) (collecting cases)). It thus makes sense that where, as here, a plaintiff relies on a successor in interest theory as the basis for the closely related test, the test will be met by default provided that the plaintiff provides an "averment of facts that, if credited by the ultimate trier of fact, would suffice to establish [a successor in interest theory]." *Chloé*, 616 F.3d at 163 (internal quotation marks and brackets omitted).

As a general rule, a corporation who purchases the assets of another is not liable for the debts and liabilities of the seller. *Cargo Partner AG* v. *Albatrans, Inc.*, 352 F.3d 41, 44-45 (2d Cir. 2003). However,

> [t]he successor liability doctrine furnishes a narrow exception to that general rule in four circumstances: ([i]) where the purchaser expressly assumed the predecessor's liability, ([ii]) where there was a consolidation or *de facto* merger of seller and purchaser,

11

> ([iii]) where the purchasing corporation was a mere continuation of the selling corporation, or ([iv]) the transaction is entered into fraudulently to escape such obligations.

*Miller*, 291 F. Supp. 3d at 525-26 (citation omitted). A "*de facto* merger occurs when a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." *New York* v. *Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (internal quotation marks and citation omitted). "At common law, the hallmarks of a *de facto* merger include: ([i]) continuity of ownership; ([ii]) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; ([iii]) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and ([iv]) continuity of management, personnel, physical location, assets, and general business operation." *Id.* While not all factors must be present, "'continuity of ownership is the essence of a merger' and is what helps [ ] distinguish a merger from an asset sale." *Id.* (quoting *Cargo Partner AG*, 352 F.3d at 47).

In support of its jurisdictional theory, Plaintiff asserts that Perch is "much more than 'closely related' to Gutter Games, it in effect is Gutter Games." (Pl. Opp. 7).[4] As support, Plaintiff asserts the following facts: (i) since Perch's acquisition of Gutter Games, Gutter Games has effectively no ongoing

---

[4] While Plaintiff discusses the majority of its jurisdictional facts in the "closely related" section of its opposition, the Court construes all pleadings, affidavits, and jurisdictional allegations "in the light most favorable to [the plaintiff], resolving all doubts in [its] favor," *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001), and finds that the facts in support of the closely related argument are identical to facts used to establish successor liability.

12

operations (*id.* at 6-8); (ii) the only current officer of Gutter Games is the CEO of Perch (*id.* at 7); (iii) all interactions between the parties since the acquisition have been between Plaintiff and Perch personnel (*id.*); (iv) it was Perch who alerted Plaintiff that it was considering terminating the Agreement, not Gutter Games (Compl. ¶ 40; Myers Decl. ¶¶ 10-11); (v) the actual Notice of Termination was sent on Perch letterhead by a Perch executive despite being signed by Gutter Games (Pl. Opp. 7; Myers Decl. ¶¶ 9, 12; Notice of Termination); (vi) self-identified Perch personnel do all of the marketing for Gutter Games products (Pl. Opp. 7); (vii) customers who attempt to contact Gutter Games for account, customer/sales, and support inquiries receive automated replies from a Perch email account (*id.*); and (viii) the Instagram account created by Plaintiff for one of Gutter Games's games changed its contact information to a Perch email address (*id.*).  What is more, Plaintiff asserts that the Perch acquisition was done as a means of fraudulently escaping Gutter Games's contractual obligations under the Agreement. (Compl. ¶¶ 38-40; Pl. Opp. 7-8; Myers Decl. ¶¶ 8, 10).  These allegations raise the possibility that: (i) Perch assumed the liabilities of Gutter Games when it assumed its assets; (ii) there was a *de facto* merger or consolidation, in part because Gutter Games allegedly ceased operations; (iii) Perch was merely a continuation of Gutter Games; (iv) the acquisition was fraudulently designed in an effort to "fabricate an exit from the Agreement" (Pl. Opp. 6-7); or some combination of the four.

Perch responds that all such arguments are devoid of factual support, and specifically notes that "Perch … did not agree to assume Gutter Games's contractual obligations when it acquired Gutter Games." (Perch Reply 3). It also asserts that the *de facto* merger doctrine is inapplicable because that doctrine "requires that the acquisition be between two entities with the same owner," and not where the two have different owners. (*Id.* at 4 (citing *Wang* v. *Abumi Sushi Inc.*, 262 F. Supp. 3d 81, 87 (S.D.N.Y. 2017))). Lastly, it notes that Plaintiff's fraud argument is frivolous and devoid of any factual support, and, in any event, that such theory only applies where a corporate transfer is made to defraud the transferor's creditors. (*Id.* (citing *Wang*, 262 F. Supp. 3d at 87)).

While Perch raises suspicions as to the validity of at least some of Plaintiff's successorship theories, and while the Court agrees with Perch that the Complaint leaves much to be desired in the way of jurisdictional facts, it finds that those facts supplied in Plaintiff's opposition brief and affidavits attached thereto, as well as Perch's arguments in response, raise issues of jurisdictional fact as to whether Perch was a successor to Gutter Games. As but one example, the acquisition agreement between Perch and Gutter Games would shed light on whether Perch explicitly or implicitly acquired Gutter Games's liabilities and contractual rights and obligations.

Because Plaintiff has alleged that Perch is closely related to Gutter Games as a successor in interest, it has made the requisite "sufficient start" towards establishing personal jurisdiction for the Court to order jurisdictional

14

discovery. *Gentry*, 2020 WL 1467358, at *8 (citation omitted). Indeed, because Plaintiff has identified a genuine issue of jurisdictional fact, and has established that its position at least as to some aspects of successor liability is not frivolous, the Court finds that limited jurisdictional discovery is warranted. *See id.*; *see also Daventree Ltd.* v. *Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction[al] discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction." (citation omitted)). To be sure, cases finding successor liability often involve more detailed allegations in the pleadings about the entities or individuals in question than what has been alleged here. *See, e.g., Arabi* v. *Javaherian*, No. 13 Civ. 456 (ERK), 2014 WL 3892098, at *8 (E.D.N.Y. May 1, 2014) (finding that the plaintiff established a *prima facie* case of personal jurisdiction under successor liability when the plaintiff alleged, *inter alia*, that the management, personnel, customers, trade suppliers, and physical location of the predecessor and successor entities were the same); *Phillips* v. *Reed Grp.*, 955 F. Supp. 2d 201, 230-31 (S.D.N.Y. 2013) (noting that the complaint alleged specific facts related to the dissolution of the predecessor entity and the formation of its successor in interest, and that the plaintiff submitted additional evidence related to successor liability in opposition to a motion to dismiss for lack of personal jurisdiction). Considering the jurisdictional allegations in the light most favorable to Plaintiff, however, the Court determines that such a determination

can — and should — be postponed until jurisdictional discovery on the issue of successor liability is complete.

### 2. Due Process Concerns

Separately, Perch argues that where, as here, a signatory to an agreement is attempting to enforce a forum selection clause against a non-signatory, there are due process concerns. Perch appears to misperceive Plaintiff's jurisdictional theory, perhaps because of Plaintiff's imprecise pleading in the Complaint. Specifically, Perch notes that "[e]ven if the closely related test were applicable to this case, the doctrine cannot overcome the constitutional limits to personal jurisdiction" because "the touchstone of [the minimum contacts] inquiry is the defendant's purposeful ties to the forum state, not its ties to the contract signatories." (Perch Reply 3; *see also* Perch Br. 11-12 (citing, *e.g.*, *Mersen USA EP Corp.* v. *TDK Elecs. Inc.*, 594 F. Supp. 3d 570, 583-84 (S.D.N.Y. 2022) (holding that "constitutional concerns prohibit the application of the 'closely related' doctrine" where the "matter has nothing to do with New York" outside of the forum selection clause); *Arcadia Biosciences, Inc.* v. *Vilmorin & Cie.*, 356 F. Supp. 3d 379, 395 (S.D.N.Y. 2019); *Truinject Corp.* v. *Nestlé Skin Health, S.A.*, No. 19-592 (LPS) (JLH), 2019 WL 6828984, at *11 (D. Del. Dec. 13, 2019) ("I have serious questions about the constitutionality of using the 'closely related' test to exercise personal jurisdiction over a non-signatory to a contract with a forum selection clause."))). While Perch is correct that there may be due process concerns under such circumstances, that argument is irrelevant here, where Plaintiff's proffered basis for enforcement

16

under the closely related test is that Perch is a successor to Gutter Games. *See Arcadia Biosciences, Inc.*, 356 F. Supp. 3d at 393 ("'[I]f successorship doctrine binds a non-signatory to the obligations of a contract … such a non-signatory/successor is … subject to the … presumption of the enforceability of mandatory forum selection clauses.'" (quoting *Aguas Lenders Recovery Grp.*, 585 F.3d at 700-01 (collecting cases))). Indeed, it is well settled that when a company is found to be a successor in interest to an entity over whom the court has personal jurisdiction, "the court gains personal jurisdiction over the successor simply as a consequence of their status as a successor in interest, without regard to whether they had other minimum contacts with the state." *LiButti* v. *United States*, 178 F.3d 114, 123-24 (2d Cir. 1999) (collecting cases).[5]

Finding that jurisdictional discovery is necessary, the Court dismisses Perch's motion to dismiss without prejudice to its renewal and declines to reach the Rule 12(b)(6) issue until it is assured of its jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendant Perch's motion to dismiss is DENIED without prejudice. The parties are directed to meet and confer regarding the process for proceeding with jurisdictional discovery within two

---

[5] As part of its argument against the application of the closely related test, Perch cites to Judge Cote's decision in *Trane International Inc.* v. *Calentadores de America, S.A. de C.V.*, No. 21 Civ. 4497 (DLC), 2022 WL 1523527 (S.D.N.Y. May 13, 2022). (Perch Br. 9). There, Judge Cote declined to enforce a forum selection clause against a non-signatory where that company was merely alleged to be a majority owner that, at one point, sent an email following up on the terms of a contract that bound its signatory subsidiary. *Id.* at *2. She explicitly noted, however, that the analysis would have been different had the non-signatory been alleged to have been a successor in interest. *Id.* As such, the case is inapposite.

weeks of this Order. Thereafter, the parties are directed to file a joint letter on or before **July 10, 2023**, alerting the Court as to what, if anything, jurisdictional discovery has disclosed with respect to Perch's status as a successor in interest to Gutter Games, and how the parties wish to proceed.

The Clerk of Court is directed to terminate the pending motion at docket number 31.

SO ORDERED.

Dated: May 9, 2023
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge