UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THAT'S WHAT SHE SAID, INC.,

                    Plaintiff,

          -v.-

GUTTER GAMES LTD. and PERCH UK 1 LTD,

                    Defendants.

---

22 Civ. 4230 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

This case arises from the fraught dissolution of the contractual relationship between Plaintiff That's What She Said, Inc. ("TWSS" or "Plaintiff"), a U.S.-based company that developed and sold the eponymous party game *That's What She Said*, and Defendant Gutter Games Ltd. ("Gutter"), a U.K.-based company that produced similarly off-color party games. In late 2019, Plaintiff and Gutter entered into a licensing agreement, pursuant to which Plaintiff was to serve as the sole distributor of various Gutter products in North America. Later, when Defendant Perch UK 1 Ltd. ("Perch," and together with Gutter, "Defendants") acquired Gutter, Defendants terminated their relationship with Plaintiff — long before the licensing agreement was set to expire — on the basis of Plaintiff's failure to achieve certain sales goals pertaining to Gutter's products.

The instant litigation followed. Plaintiff sued Defendants for breach of contract, *inter alia*, alleging that Defendants' termination of the parties' agreement was improper. Soon after, Gutter sued Plaintiff for breach of contract, *inter alia*, primarily in an effort to recuperate certain royalty

payments on Plaintiff's sales of Gutter's products that Plaintiff was withholding from Gutter.

Before the Court is Defendants' motion for summary judgment, which seeks judgment in favor of Defendants on all of Plaintiff's claims and judgment in favor of Gutter on Gutter's counterclaims.  For the reasons that follow, the Court grants Defendants' motion in full.

**BACKGROUND**[1]

## A.    Factual Background

### 1.    The Parties

Plaintiff TWSS is a company based in the United States that has, since the 2010s, developed, produced, and sold the popular party game *That's What*

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment.  The Court primarily sources facts from Defendants' Local Rule 56.1 Statement (Dkt. #78 ("Def. 56.1")) and Plaintiff's Local Rule 56.1 Counter-Statement (Dkt. #95 ("Pl. 56.1")); the Declaration of John P. Curley (Dkt. #74 ("Curley Decl.")), submitted in connection with Defendants' motion, and certain of the exhibits attached thereto ("Curley Decl., Ex. [ ]"), including a copy of the parties' Brand/Product License Agreement (Curley Decl., Ex. A ("LA")); the Declarations of Dan Myers (Dkt. #83-1 ("Myers Decl.")) and Richard Mooney (Dkt. #84 ("Mooney Decl.")), submitted in connection with Plaintiff's opposition to Defendants' motion, and certain of the exhibits attached thereto ("[ ] Decl., Ex. [ ]"); and the Complaint (Dkt. #1 ("Compl.")).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Where Plaintiff agrees to a fact set forth in the Defendants' Rule 56.1 Statement in its entirety, the Court cites only to the Defendants' Rule 56.1 Statement.

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion for summary judgment as "Def. Br." (Dkt. #77); to Plaintiff's memorandum

2

*She Said.*  (Pl. 56.1 ¶ 55).  Plaintiff is incorporated in Delaware with its principal place of business in the state of Washington.  (Compl. ¶ 12).  Dan Myers serves as Plaintiff's President.  (Def. 56.1 ¶ 3).

Defendant Gutter is a "limited liability company," as that term is defined under English law, based in the United Kingdom.  (Compl. ¶ 3).  Gutter develops and sells a variety of party games.  (Def. 56.1 ¶ 1).  Gutter was founded by Zak and Kate Walton (together, the "Waltons").  (*Id.*).

Like Gutter, Defendant Perch is a "limited liability company," as that term is defined under English law, based in the United Kingdom.  (Compl. ¶ 4). In late 2021, Perch acquired Gutter.  (Def. 56.1 ¶ 41).

### 2.    The License Agreement

On September 12, 2019, Plaintiff and Gutter entered into a Brand/Product License Agreement (the "License Agreement"), pursuant to which agreement Plaintiff was given the exclusive right to "manufacture, make, sell, distribute, promote, [and] market" various Gutter products in the United States and Canada.  (Def. 56.1 ¶ 2; LA §§ 1(b)).  The products subject to the License Agreement included the party games *Gutterhead*, the *Gutterhead* Expansion Pack, *Trunk of Drunk*, *Bachelorette Bundle*, *Beat That!*, and *Destination Drunk* (each a "Game," and collectively, the "Games").  (Def. 56.1 ¶ 5; LA sched. A).  Under the License Agreement, Gutter agreed to pay Plaintiff

---

of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #94); to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #85).

a royalty of eight percent of its gross revenues from sales of the Games in the North American market.  (LA §§ 1(a)-(b), 5(a)(i)).

Importantly, the License Agreement obligated Plaintiff to use "commercially reasonable efforts" to achieve certain "minimum sales targets" for the Games.  (LA §§ 6(a), 9(b)-(c), sched. C).  Specifically, Schedule C of the License Agreement set forth two sets of sales targets that Plaintiff was required to meet each year (collectively, the "Sales Targets").  (*See generally id.*, sched. C).  *First*, Plaintiff was required to sell a certain minimum quantity of each Game and of all of the Games in the aggregate (the "Quantity Targets").  (*See id.* § 6(a), sched. C).  Specifically:

- ▪ "The number of units sold of each [Game] … must be equal to or greater than the applicable number set forth in [Schedule C] for that year" (the "Per-Game Quantity Target"); and

- ▪ "[T]he aggregate number of units [sold] of all [Games]… must be equal to or greater than the applicable number set forth in [Schedule C] for that year" (the "All-Games Quantity Target").

(*Id.*, sched. C).  *Second*, Plaintiff was required to sell three times the number of each Game, and of all of the Games in the aggregate, that Gutter sold in the U.K. that same year (the "3X Targets").  (*See id.* § 6(a), sched. C).  Specifically:

- ▪ "The number of units sold of each [Game]… must be equal to [three] times the number of units of that same Game sold by [Gutter] in the U.K. in that year"  (the "Per-Game 3X Target"); and

- ▪ "[T]he aggregate number of units sold of all [Games] must be equal to [three] times the number of units of all Games sold by [Gutter] in the U.K. in that year" (the "All-Games 3X Target").

(*Id.,* sched. C).

Relevant to the instant dispute, if Plaintiff failed to meet either of the Sales Targets pertaining to its sales of the Games in the aggregate (*i.e.*, the All-Games Quantity Target or the All-Games 3X Target, together, the "All-Games Targets"), Gutter was entitled to terminate the License Agreement, subject to certain exceptions and limitations, pursuant to its Section 6(c)(ii) (the "Termination Provision").  (LA § 6(c)(ii); *see also* Pl. 56.1 ¶ 8 (describing such exceptions and limitations)).  As a counterpart to the Termination Provision, the License Agreement provided that any invocation of the Termination Provision would be deemed canceled if Plaintiff could demonstrate "reasonable sales uplift" during the three-month period following a termination attempt (the "Cure Provision").  (LA § 6(d)(ii); *see also* Pl. 56.1 ¶ 8).  Further, the Cure Provision indicated that demonstrating "reasonable sales uplift" required Plaintiff to "provide reasonable evidence that sales for [u]nderperforming [Games] [we]re expected to meet the applicable Sales Targets for the [calendar year] just beginning."  (LA § 6(d)(ii)(A); *see also* Pl. 56.1 ¶ 43).

Plaintiff had a number of other obligations under the License Agreement, primarily concerning data collection and sharing.  For instance, on a quarterly basis, Plaintiff was required to report to Gutter the "[number of] units [of each of the Games] sold and gross sale dollars … broken down by wholesale (by customer), direct-to-consumer retail on [Plaintiff]-owned websites, and direct-to-consumer retail on Amazon.com."  (LA § 7(a)).  Plaintiff was also responsible

for sharing "data on advertising reach and engagement" with Gutter and for "maintain[ing] accurate books and records … relating to manufacturing, marketing[,] and sales" of the Games. (*Id.* § 7(a)-(b)). Finally, the License Agreement obligated Plaintiff to — "using reasonable efforts and good faith" — "share and discuss [with Gutter] lessons learned and best practices" for selling the Games. (*Id.* § 7(d)).

### 3.    Defendants' Promise Not to Enforce the Sales Targets

According to Plaintiff, on March 5, 2020, in a conversation between and among Dan Myers (again, Plaintiff's President); his wife, Samantha Myers (also Plaintiff's employee); and Zak and Kate Walton (again, Gutter's founders), *inter alia*, Gutter promised not to invoke the Sales Targets as a basis for terminating the License Agreement. (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28). Defendants characterize this conversation as an invalid "oral modification" of the License Agreement, pursuant to which Gutter agreed to remove the Sales Targets from the License Agreement and Plaintiff agreed not to "drop any products" and to help with "some of [Gutter's] marketing stuff" in return. (Def. 56.1 ¶ 33; *see, e.g.*, Def. Br. 1-2). Plaintiff, on the other hand, posits the conversation as an "oral promise" not to enforce the Sales Targets against Plaintiff, sufficient to estop Defendants doing so thereafter. (Pl. 56.1 ¶ 28; *see, e.g.*, Pl. Br. 11-12). Regardless of the appropriate legal classification, the parties do not dispute that this conversation was never memorialized in writing. (Def. 56.1 ¶ 39).

While the precise details of the parties' conversation are unknown, the individuals involved testified as to their recollections of the discussion.

6

Samantha Myers testified that, after Plaintiff's representatives expressed concern that Plaintiff was not going to be able to meet the Sales Targets, the Waltons assured Plaintiff "that they[] [the Waltons] [a]re not going to pull the contract from [Plaintiff]" because of Plaintiff's lackluster performance. (Curley Decl., Ex. E ("S. Meyers Depo. Tr.") at 102:4-18; *see* Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36). Samantha Myers also claimed that Kate Walton expressed that Plaintiff was "doing great" and that Gutter "really love[d] working with [Plaintiff]." (Def. 56.1 ¶ 37). Dan Myers recalled that Kate Walton said that "we [Gutter] are not going to take anything away from you [Plaintiff]." (*Id.* ¶ 30). Dan Myers further claimed to have left the conversation with "the impression that the License Agreement['s] [S]ales [T]argets were deleted entirely and in perpetuity." (*Id.* ¶ 32; Pl. 56.1 ¶ 32).

In 2021, Plaintiff approached Gutter with concerns regarding its ability to meet the Sales Targets. (Pl. 56.1 ¶¶ 95-96; Myers Decl. ¶ 22). Plaintiff suggested that it "could take steps that would ensure it reached the [Sales Targets], including[,] for example [i] paying for air freight; [ii] ordering additional units [of the Games] with the likelihood but not certainty that they would arrive in time for the Christmas rush; and/or [iii] making direct sales to bulk downscale retailers like TJ Maxx and Home Goods." (Pl. 56.1 ¶ 97; *see also* Myers Decl., Ex. B.). Plaintiff further recounted that, in response, Gutter asked Plaintiff "not [to] take those steps, as they would significantly impact revenue and margin (and thus [Gutter's] royalty) and would irreversibly damage the long-term prospects of the brand and [the] [G]ames." (Pl. 56.1 ¶ 98; *see*

7

*also* Myers Decl. ¶ 31 ("[C]reating additional sales through discounting, sales, or placement in less prestigious outlets … diminish[es] the value and appeal of [] products to actual and potential customers.")).  As a result of this conversation, Plaintiff was under the impression that "the sales targets for 2021 would not be enforced if [Plaintiff] conducted itself as the parties agreed would be in the best interest of the [Games] in the long run, by not seeking to maximize current sales volume at the expense of margins and profits."  (Pl. 56.1 ¶ 31).

### 4.    Defendants Terminate the License Agreement

In both calendar years 2020 and 2021, the first and second years that the License Agreement was in effect, Plaintiff failed to meet a number of the Sales Targets.  (Def. 56.1 ¶¶ 22-23; Pl. 56.1 ¶¶ 22-23).  For instance, in 2021, Plaintiff failed to meet the All-Games 3X Target.  (Def. 56.1 ¶ 24).  That year, Plaintiff sold only 324,929 units of all of the Games in the aggregate, far short of the requisite 641,931 units (*i.e.*, three times the 213,977 units that Gutter had sold in the United Kingdom) called for by the All-Games 3X Target.  (*Id.*).

On September 27, 2021, the Waltons informed Plaintiff that Gutter had been sold to Perch.  (Def. 56.1 ¶ 41).  Soon thereafter, on January 21, 2022, Defendants sent Plaintiff a notice purporting to terminate the License Agreement.  (*Id.* ¶ 42).  The January 21, 2022 letter set forth two bases for Defendants' attempt to terminate the License Agreement (the "Termination Attempt"):  *first*, Defendants cited the License Agreement's change-of-control provision (the "Change-of-Control Provision") (*see* Curley Decl., Ex. I

(January 21, 2022 letter from Defendants to Plaintiff)), which provision allowed for the termination of the License Agreement in the event of the "sale or transfer of all or substantially all of the assets, or a merger or consolidation of [a] party or a transfer of ownership that results in a change of control of such party" (LA § 9(f)); *second*, Defendants cited the License Agreement's Termination Provision, and Plaintiff's failure to meet the Sales Targets during the 2021 calendar year (*see* Curley Decl., Ex. I).

Importantly, it would later be confirmed that the License Agreement's Change-of-Control Provision was an invalid basis for terminating the agreement under the circumstances, for reasons irrelevant to the instant dispute.  (Pl. 56.1 ¶¶ 108-112).  Accordingly, Defendants were left with only Plaintiff's failure to meet the Sales Targets as grounds for the Termination Attempt.

### 5.    Plaintiff Attempts to Demonstrate "Reasonable Sales Uplift"

A few months after the Termination Attempt, in late April 2022, Plaintiff reported its sales for calendar year 2022 to date to Perch.  (Def. 56.1 ¶ 44). Specifically, Plaintiff reported sales of 52,370 units of the Games between January 1 and March 30, 2022, slightly fewer than the 57,444 units that Plaintiff had sold during the same period in 2021.  (*Id.* ¶ 45).  Perch concluded that the "flat" numbers reported by Plaintiff indicated that Plaintiff would also fail to meet the Sales Targets in 2022 and, accordingly, that Plaintiff had not shown "reasonable sales uplift" pursuant to the License Agreement's Cure Provision during the three months that followed Gutter's Termination Attempt. (*Id.* ¶ 47; Pl. 56.1 ¶ 47).

Plaintiff claims that these numbers do, in fact, demonstrate "reasonable sales uplift" in the first three months of 2022, and that even if they do not, Plaintiff would have made "significant additional sales" of the Games but for Defendants' conduct.  (Pl. 56.1 ¶ 45).  Specifically, Plaintiff cites Defendants' earlier representation that the basis for Defendants' termination of the License Agreement was its Change-of-Control Provision.  (*Id.*).  According to Plaintiff, Defendants' representation that the License Agreement "was immediately terminated pursuant to the 'change of control' clause … made further investment and sales effectively impossible."  (*Id.*).  Importantly, as the Court previously noted, the letter sent by Defendants notifying Plaintiff of the Termination Attempt cited both the Change-of-Control Provision and Plaintiff's failure to meet the Sales Targets as Defendants' bases for the Termination Attempt.  (Def. 56.1 ¶ 42; *see generally* Curley Decl., Ex. I (January 21, 2022 letter from Perch to Plaintiff)).

Neither party disputes the fact that, in the period following the Termination Attempt, Plaintiff has withheld the payment of royalties for all sales of the Games that Plaintiff made subsequent to that attempt (at least $114,500.86 in payments).  (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49 (indicating fact not disputed)).

## B.    Procedural Background

Plaintiff initiated this action on May 23, 2022, by filing a complaint (the "Complaint") against Defendants.  (*See generally* Compl.).  The Complaint asserts three causes of action: (i) breach of the License Agreement;

(ii) anticipatory breach of the License Agreement; and (iii) breach of the covenant of good faith and fair dealing. (*See id.* ¶¶ 51-64). After the filing of the Complaint, this litigation proceeded for some time on two separate tracks, one as to Defendant Perch and the other as to Defendant Gutter. The Court first discusses the litigation as it proceeded with respect to Perch, and then, as it (simultaneously) proceeded with respect to Gutter. Finally, the Court sets forth the events of late 2023 and beyond, when the two tracks merged, and the litigation proceeded as one.

### 1. The Perch Track

In lieu of filing an answer to the Complaint, on July 29, 2022, Perch filed a pre-motion letter expressing its intent to file a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim pursuant to Rule 12(b)(6). (Dkt. #16). The Court held a pre-motion conference on September 7, 2022, and ultimately granted Perch leave to file its anticipated motion. (Dkt. #19).[2] Perch filed its motion to dismiss and accompanying papers on December 2, 2022. (Dkt. #31-32). Plaintiff thereafter filed its opposition and accompanying papers on

---

[2] At the pre-motion conference, apart from the discussion of Perch's anticipated motion to dismiss, all parties expressed an interest in appearing before a magistrate judge for a settlement conference. The Court thus referred this case to Magistrate Judge Stewart D. Aaron for such a conference on September 8, 2022, and stayed Perch's discovery obligations pending the outcome of those discussions. (*See* September 7, 2022 Minute Entry; *see also* Dkt. #23).

Magistrate Judge Aaron held a settlement conference on October 26, 2022. (*See* October 26, 2022 Minute Entry). Unfortunately, however, the parties were unable to resolve their dispute. Upon learning that settlement efforts had failed, the Court directed the parties to file a joint letter proposing a briefing schedule for Perch's motion to dismiss, which letter was filed on November 10, 2022. (Dkt. #27). The Court then adopted the parties' proposed briefing schedule. (Dkt. #28).

December 30, 2022 (Dkt. #33), and Perch filed its reply on January 13, 2023 (Dkt. #34).

On May 9, 2023, the Court issued an Opinion and Order denying without prejudice Perch's motion to dismiss.  (Dkt. #56).  The Court ordered the parties to proceed with a period of jurisdictional discovery and to report thereafter on "what, if anything, jurisdictional discovery has disclosed" with respect to the Court's exercise of personal jurisdiction over Perch.  (*Id.* at 18).  On July 10, 2023, Plaintiff and Perch filed a joint letter indicating that supplemental discovery had not resolved the parties' disagreement on the matter.  (Dkt. #63). That said, in the same letter, Perch indicated that it would, "in the interests of judicial economy, ... defer [any] motion [renewing its jurisdictional argument(s)] until the close of discovery." (*Id.* at 2).

### 2.    The Gutter Track

Unlike Perch, Gutter declined to file a motion to dismiss the Complaint, and instead filed an answer and several counterclaims against Plaintiff on July 29, 2022.  (Dkt. #15 (Gutter's answer), 20 (as amended)).  Specifically, Gutter brought claims against Plaintiff for (i) breach of contract, (ii) specific performance, and (iii) attorneys' fees.  (*See generally* Dkt. #20).  On November 29, 2022, Plaintiff filed an answer to Gutter's counterclaims.  (Dkt. #29).  Thereafter, the case between Plaintiff and Gutter proceeded directly to discovery: on March 16, 2023, the parties filed a proposed case management plan and scheduling order (Dkt. #46), which the Court promptly endorsed (Dkt. #47).

As discovery proceeded, Plaintiff repeatedly failed to comply with Court-ordered deadlines. (*See* Dkt. #59 (detailing "Plaintiff's Repeated Non-Compliance with Discovery Orders")). On June 12, 2023, the Court issued an order requiring Plaintiff to show cause why its case should not be dismissed for (i) failure to prosecute and (ii) repeated failure to comply with this Court's orders and its Individual Rules. (Dkt. #60). Plaintiff filed a response to the Court's order to show cause on June 23, 2023 (Dkt. #61), and the Court vacated the same (Dkt. #62).

The Court then ordered the parties to appear for a conference on August 3, 2023, to discuss next steps in the action, including the schedule for any remaining discovery. (Dkt. #62). At the August 3, 2023 conference, the Court reset the deadlines for the completion of all outstanding discovery, namely, the parties' exchange of expert reports and corresponding depositions. (*See* August 3, 2023 Minute Entry). The Court further ordered Defendants to, "[w]ithin a week after [the] close of expert discovery, … inform the Court if the parties will move forward with settlement negotiations, or summary judgment motion practice with a proposed briefing schedule." (*Id.*).

### 3. The Two Tracks Merge

On November 22, 2023, following the conclusion of discovery, Defendants filed a letter indicating that "the parties have discussed settlement but have not been able to reach a resolution," and proposed a schedule for briefing on Defendants' anticipated joint motion for summary judgment. (Dkt. #69). The Court endorsed the parties' proposed schedule (Dkt. #70), and on

13

January 12, 2024, Defendants filed their joint motion for summary judgment and accompanying papers (Dkt. #73-78), including a memorandum of law in support of their motion (Dkt. #76 (redacted); Dkt. #77 (sealed)); the accompanying declaration of John P. Curley (Dkt. #74); and a statement of material facts pursuant to Local Rule 56.1 ("Rule 56.1 Statement") (Dkt. #75 (redacted); Dkt. #78 (sealed)).  Defendants also filed a letter motion asking the Court to exclude the testimony of Plaintiff's damages expert, Lindsay Greenbaum, who was retained by Plaintiff to opine on Plaintiff's "lost profits" measure of damages.  (Dkt. #79).[3]

Also on January 12, 2024, Defendant Perch filed a letter indicating that it was "withdrawing its challenge to personal jurisdiction" and requested until January 26, 2024, to file an answer to the Complaint.  (Dkt. #71).  The Court granted Perch's request (Dkt. #80), and on January 26, 2024, Perch filed its answer (Dkt. #82).

On February 23, 2024, Plaintiff filed papers opposing Defendants' motion for summary judgment (Dkt. #83-84, 89-90), including a memorandum of law (Dkt. #83), as well as the accompanying declarations of Richard Mooney (Dkt. #89 (redacted); Dkt. #84 (sealed)) and Dan Myers (Dkt. #90 (redacted); Dkt. #83-1 (sealed)).  Conveniently, Plaintiff responded to Defendants' letter motion to exclude the testimony of Plaintiff's damages expert in its memorandum of

---

[3]    Because the Court is granting Defendants' motion for summary judgment in full, Defendants' request for an order excluding the testimony of Plaintiff's damages expert, Lindsay Greenbaum, is moot.  Accordingly, the Court need not, and indeed does not, address the request herein.

law opposing Defendants' summary judgment motion.  (*See* Dkt. #83 at 20 n.4).  Finally, on March 15, 2024, Defendants filed a memorandum of law in further support of their motion (Dkt. #85), concluding briefing on the motion.

On May 22, 2024, in reviewing the parties' briefing for the purposes of preparing this Opinion and Order, the Court discovered that Plaintiff had failed to file a statement responding to Defendants' Rule 56.1 Statement in accordance with Local Rule 56.1(b).  The Court thus ordered Plaintiff to

> file [such statement] on or before May 31, 2024 … [and] file an amended Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, converting all record citations therein to its [own (newly filed)] Rule 56.1 Statement.

(Dkt. #91).  On May 30, 2024, Plaintiff filed a Rule 56.1 Statement responding to Defendants' Rule 56.1 Statement (Dkt. #92), but not an updated memorandum of law.  On June 4, 2024, "remain[ing] dismayed … by Plaintiff's continued inability to abide by the Court's orders," the Court issued another order giving Plaintiff until June 7, 2024, to file an amended memorandum of law and come into full compliance with the Court's May 22, 2024 Order (Dkt. #93).  On June 7, 2024, Plaintiff filed the amended memorandum (Dkt. #94).  Finally, on June 21, 2024, Defendants filed a supplemental letter briefly addressing Plaintiff's amended filings.  (Dkt. #96).

## DISCUSSION

### A.    Applicable Law

To succeed on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), a litigant must "show[] that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);[4] *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno* v. *Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P.* v. *Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). Further, a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

In considering whether the movant has met its burden to "show that no genuine factual dispute exists," a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). That said, the non-movant "may not rely on unsupported assertions, conjecture[,] or surmise" to manufacture factual disputes. *Balderramo* v. *Go New York Tours Inc.*, 668 F. Supp. 3d 207, 219 (S.D.N.Y. 2023). Rather, to defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson*, 477 U.S. at 256-57).

---

[4]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

### B.    Analysis

As previously noted, the Complaint asserts three causes of action: (i) breach of the License Agreement; (ii) anticipatory breach of the License Agreement;[5] and (iii) breach of the implied covenant of good faith and fair dealing.  (*See generally* Compl.).  Broadly speaking, Plaintiff's claims all stem from Defendants' reliance on the Sales Targets — which Gutter allegedly promised not to enforce — to justify their termination of the License Agreement.  (*Id.*).  Gutter's three counterclaims against Plaintiff, on the other hand, are for: (i) breach of contract, (ii) specific performance, and (iii) attorneys' fees.  (*See generally* Dkt. #20).  Gutter alleges that Plaintiff, based on its false conviction that Gutter breached the License Agreement, wrongfully "withh[eld] royalty payments from Gutter … pending this litigation."  (Def. Br. 3).

Defendants' motion seeks summary judgment in favor of Defendants on all of Plaintiff's claims, thus dismissing the Complaint in its entirety, and judgment in favor of Gutter on Gutter's counterclaims.  (*See generally* Def. Br.).  In the discussion that follows, the Court first addresses Plaintiff's claims, beginning with its breach-of-contract claim and moving to its breach of the implied covenant of good faith and fair dealing claim.  The Court then

---

[5]    In course of the briefing on the instant motion, Plaintiff abandoned its claim for anticipatory breach of contract.  (*See* Pl. Opp. 8 ("Defendants argue that the cause of action for anticipatory breach of contract should be removed from the case, a position with which Plaintiff agrees given that Defendants have completed the implementation of their wrongful conduct.")).  Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiff's anticipatory breach of contract claim and analyzes herein only Plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing.

addresses Gutter's counterclaims.  Ultimately, the Court finds in favor of Defendants on all claims and counterclaims.

### 1. The Court Grants Defendants Summary Judgment on Plaintiff's Breach-of-Contract Claim

Under New York law,[6] the elements of a breach-of-contract claim are: (i) existence of a contract, (ii) performance of the contract by one party, (iii) breach by the other party, and (iv) damages.  *See Terwilliger* v. *Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).  At the summary judgment stage, the court's task is to determine whether a triable dispute of fact remains as to the plaintiff's satisfaction of these elements.  *Proline Concrete of WNY, Inc.* v. *G.M. Crisalli & Assocs., Inc.*, 112 N.Y.S.3d 406, 408 (4th Dep't 2019).

"Where the question of liability turns on applying the unambiguous language of a contract to undisputed facts," a court may grant summary judgment on a breach-of-contract claim.  *Fed. Deposit Ins. Corp.* v. *Murex LLC*, 500 F. Supp. 3d 76, 94 (S.D.N.Y. 2020); *see also 3Com Corp.* v. *Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999) ("[T]he court may resolve ambiguity in contract language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." (alterations adopted) (internal quotation marks omitted)).

---

[6]    Interpretation of the License Agreement is governed by New York law in accordance with its Section 16.  (*See* LA § 16 ("This Agreement shall be construed in accordance with the law of the state of New York, United States, without respect to its choice of law principles.")).  Further, both parties apply New York law in support of their respective interpretations of the Agreement.  (*See, e.g.*, Def. Br. 12-13; Pl. Opp. 11-12).  *See also Am. Fuel Corp.* v. *Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

Further, contract language is clear and unambiguous where it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed* v. *Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978); *accord Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989). In interpreting contract language, the court's primary objective is always "to give effect to the intent of the parties as revealed by the language they chose to use." *Bolt Elec., Inc.* v. *City of New York*, 223 F.3d 146, 150 (2d Cir. 2000).

As previously noted, Plaintiff's breach-of-contract claim arises from what was, in Plaintiff's view, Defendants' unauthorized termination of the License Agreement on the basis of Plaintiff's failure to meet the Sales Targets. (*See* Compl. ¶¶ 43, 45-48). In the instant motion, Defendants argue that they are entitled to summary judgment on Plaintiff's breach-of-contract claim because there is no dispute of fact that (i) Defendants' termination of the License Agreement was proper, and did not constitute breach, and (ii) Plaintiff has not established any recoverable damages. The Court addresses each contention in turn, agreeing as to both, and finds that Defendants are entitled to summary judgment on Plaintiff's breach-of-contract claim.

### a. Defendants' Termination of the License Agreement Was Proper

The Court first addresses whether Defendants' termination of the License Agreement was proper. Importantly, there is no dispute that Plaintiff did not meet the Sales Targets in 2020 and 2021. (Def. 56.1 ¶¶ 22-23; Pl. 56.1 ¶¶ 22-

23).  Rather, Plaintiff argues that its failure to meet the Sales Targets cannot be used to justify Defendants' termination of the License Agreement, rendering such termination improper.  (Pl. Opp. 10-19).  Plaintiff sets forth four alternative theories in support of its position: (i) Defendants are estopped from enforcing the Sales Targets, because they promised not to do so; (ii) Defendants waived enforcement of the Sales Targets via the License Agreement's waiver provision; (iii) the License Agreement's *force majeure* clause excused Plaintiff's failure to meet the Sales Targets; and (iv) Plaintiff was improperly denied the opportunity to cure its failure to meet the Sales Targets pursuant to the License Agreement's Cure Provision.  The Court addresses each theory in turn, concluding that none provides a basis for invalidating Defendants' termination of the License Agreement, and, accordingly, that such termination was proper.

### i.      Defendants Are Not Estopped from Enforcing the License Agreement

Plaintiff contends first that Defendants should be estopped from enforcing the Sales Targets because the evidence shows that Gutter "specifically and repeatedly asked Plaintiff *not* to try to maximize U.S. sales, because [Gutter] preferred to keep the [Games] out of non-premium sales channels," and "accompanied those requests with specific assurances that the Sales Targets would not be used to terminate the [License] Agreement."  (Pl. Opp. 11 (emphasis in original)).  In making this argument, Plaintiff asserts, for the first time, a claim for promissory estoppel.  (*See id.* at 12 n.2 ("[T]his argument is properly styled as a claim for promissory estoppel as opposed to an estoppel precluding termination as part of the breach-of-contract claim[.]");

Def. Reply 3 ("[Plaintiff] did not plead promissory estoppel and cannot add a new claim now.")).  Of course, Plaintiff cannot amend its pleading to add a promissory estoppel claim via the instant motion.  To preempt a potential motion to amend the Complaint to add such claim, however, the Court assesses the viability of Plaintiff's promissory estoppel claim herein, finding it without merit.

Under New York law, the doctrine of promissory estoppel is a "legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract." *Bader* v. *Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2011) (citation omitted).  To succeed on a promissory estoppel theory, a promisee must demonstrate that (i) the promisor made a "clear and unambiguous promise"; (ii) the promisee's reliance on that promise was "reasonable and foreseeable"; and (iii) the promisee was injured "as a result of the reliance." *Kaye* v. *Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).  What is more, "[a] promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel." *Lamda Sols. Corp.* v. *HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 215 (S.D.N.Y. 2021) (quoting *Bd. of Trs. ex rel. Gen. Ret. Sys. of Detroit* v. *BNY Mellon, N.A.*, No. 11 Civ. 6345 (RJS), 2012 WL 3930112, at *6 (S.D.N.Y. Sept. 10, 2012)).

Importantly, "[t]he existence of a valid and enforceable contract governing a particular subject matter precludes recovery under a promissory estoppel cause of action arising out of the same subject matter." *Bennett* v. *State Farm*

21

*Fire & Cas. Co.*, 121 N.Y.S.3d 298, 299 (2d Dep't 2020). That is, a claim

sounding in promissory estoppel is precluded "in the absence of a legal duty

independent of the contract." *Goldberg* v. *Pace Univ.*, 535 F. Supp. 3d 180,

199-200 (S.D.N.Y. 2021), *aff'd*, 88 F.4th 204 (2d Cir. 2023). Courts frequently

apply this limiting principle to foreclose recovery on a promissory estoppel

theory.

In *Bennett* v. *State Farm Fire & Casualty Co.*, for instance, defendant

State Fire Farm and Casualty Company ("State Farm") provided coverage to

plaintiffs pursuant to a homeowner's insurance policy for the remediation of

the plaintiffs' property following an oil contamination incident in May 2011.

121 N.Y.S.3d at 298. Under the policy, State Farm's coverage extended to the

remediation of the plaintiffs' property as directed by the New York State

Department of Environmental Conservation (the "DEC"). *Id.* In December

2011, the DEC issued a determination that "the cleanup of contaminated soils,

consistent with DEC policy and procedures, [had] been achieved at [the

plaintiffs' property] and no further remedial activities [were] necessary." *Id.* at

298-99. Subsequently, the plaintiffs brought a promissory estoppel claim

against State Farm, alleging that the insurance carrier had failed to fulfill its

promise to them to pay to remediate certain areas of their property pursuant to

a more stringent remedial standard than that imposed by the DEC. *Id.* at 299.

The Second Department granted summary judgment to State Farm on

the plaintiffs' promissory estoppel claim. *Bennett*, 121 N.Y.S.3d at 299. In its

decision, the court explained:

> State Farm demonstrated its *prima facie* entitlement to judgment as a matter of law … by demonstrating that there was a valid and enforceable contract, namely, the homeowner's insurance policy, covering the scope of the dispute between the parties regarding State Farm's obligation to pay to remediate [the plaintiffs'] property.

*Id.* Stated differently, "[t]he existence of the [homeowner's insurance] policy precluded recovery under [a] cause of action sounding in promissory estoppel." *Id.*

Much in the same way, Plaintiff's promissory estoppel claim is precluded by the existence of the License Agreement. Here, neither party disputes the enforceability of the License Agreement; further, the License Agreement clearly "cover[s] the scope of the dispute between the parties," *Bennett*, 121 N.Y.S.3d at 299, in that it sets forth how the Sales Targets are to be enforced (*see generally* LA §§ 6, 9, sched. C). *See also WCA Holdings III, LLC* v. *Panasonic Avionics Corp.*, No. 20 Civ. 7472 (GHW), 2023 WL 8434776, at *18 (S.D.N.Y. Dec. 5, 2023) ("[P]romissory estoppel … is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason."); *accord O'Grady* v. *BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. 2015) ("This action is decidedly based on, and arises out of, [a] contract. As such, [the plaintiff] may not seek recovery based on … promissory estoppel."), *aff'd*, 646 F. App'x 2 (2d Cir. Apr. 14, 2016) (summary order). Accordingly, Plaintiff's promissory estoppel claim cannot survive summary judgment.

Even if Plaintiff's promissory estoppel claim were not precluded by the existence of the License Agreement, however, Plaintiff has not set forth sufficient evidence to create a triable issue of fact on such claim. In particular, the Court finds that the evidence fails to show a "clear and unambiguous" promise not to enforce the Sales Targets on the part of Gutter. *Kaye*, 202 F.3d at 615. Indeed, unhelpfully (and perhaps revealingly), Plaintiff's brief in opposition to Defendants' motion offers not a single citation for its claim that "Defendants do not and cannot deny that they explicitly told Plaintiff that they would not use the Sales Targets to terminate the [License] Agreement." (Pl. Opp. 13).

Upon its own review of the record, the Court finds that the evidence that best supports Plaintiff's claim amounts to:

- The assertions in the Declaration of Dan Myers to the effect that "[Gutter] repeatedly assured us [Plaintiff] that, as previously promised, the Sales Targets would not be used against us [Plaintiff]," *i.e.*, "that [Plaintiff] not tripling G[utter]'s sales could not be [Gutter's] basis for terminating the [License] Agreement." (Myers Decl. ¶¶ 22, 31).

- The deposition testimony of TWSS employee Mohsin Gulamhussein, who testified that "we have messages of [the Waltons] telling us [Plaintiff] that we're doing a great job, and we have nothing to worry about"; that "[w]e were definitely told that … the numbers didn't matter as long as we were continuing to do a good job"; and that "[we] have a message … specifically stating something along those lines," which message was sent sometime "between … the end of 2020 and 2021[.]" (Mooney Decl., Ex. C ("Gulamhussein Depo. Tr.") at 239:23-25, 240:18-23, 241:2-9).

24

● The deposition testimony of Samantha Myers, stating that her understanding following a March 2020 conversation with Defendants was that the parties were in "agreement that [Gutter was] not going to pull the contract from [Plaintiff] because [the] Game[s] w[ere] not performing," but that the parties never put as much in writing. (Curley Decl., Ex. E ("S. Myers Depo. Tr.") at 102:4-8).

These statements plainly do not surmount the "clear and unambiguous" bar. That Gutter made "assurances" that the Sales Targets would not be "used against [Plaintiff]," and that "the numbers didn't matter as long as [Plaintiff was] continuing to do a good job" — though suggestive of an effort to countenance Plaintiff's lackluster performance — cannot be construed as "clear and unambiguous" promises not to use the Sales Targets as a basis for terminating the License Agreement. *See, e.g.*, *Media Sport & Arts s.r.l.* v. *Kinney Shoe Corp.*, No. 95 Civ. 3901 (PKL), 1997 WL 473968, at *13 (S.D.N.Y. Aug. 20, 1997) (finding defendant's statement that "[the parties] are going to make a great team" was not a clear and unambiguous promise to sell plaintiff certain marketing and television rights). Indeed, none of Plaintiff's employees could articulate the precise terms of Gutter's promise or point to any written primary source material setting forth the same. *See Cohen* v. *Lehman Bros. Bank, FSB*, 273 F. Supp. 2d 524, 529-30 (S.D.N.Y. 2003) (dismissing promissory estoppel claim at summary judgment where plaintiff's employee testified that defendant had made a promise to him to complete a deal within a certain timeframe, though employee did not remember "specifically" what

defendant said).  As such, even if Plaintiff's promissory estoppel claim were not precluded by the License Agreement, it fails all the same.

As a final note, under New York law, promissory estoppel permits recovery only of "'reliance damages,' namely, the actual expenditure made in preparation for performance or in performing the work which has been induced by the defendant-promisor."  *Cyberchron Corp.* v. *Calldata Sys. Dev., Inc.*, 47 F.3d 39, 46 (2d Cir. 1995).  Here, Plaintiff seeks to recover only "the *profits* that it lost due to Defendants' breach of the [License] Agreement" (Pl. Opp. 19 (emphasis added)), damages that could not have resulted from Plaintiff's reliance on Gutter's promise not to enforce the Sales Targets, *see, e.g.*, *Darby Trading Inc.* v. *Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008) ("[C]ourts have consistently rejected promissory estoppel claims when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage to business reputation."); *Esquire Radio & Elecs., Inc.* v. *Montgomery Ward & Co.*, 804 F.2d 787, 794 (2d Cir. 1986) (affirming award of reliance damages that "exclud[ed] any benefit of the bargain profit that [plaintiff] would have realized had [defendant] not repudiated.").  To that end, Plaintiff does not seek a remedy that a promissory estoppel action can provide.

### ii.    Defendants Did Not Waive Enforcement of the License Agreement

Plaintiff's second argument in support of its claim that Defendants' termination of the License Agreement constituted a breach of that agreement relies on Gutter's purported waiver of the Sales Targets.  (Pl. Opp. 12-13).  By

way of background, the License Agreement contains an explicit waiver

provision concerning the All-Games Targets:

> If [Plaintiff] fails to meet [either of] the [All-Games] Target[s] for the applicable year, then … [Gutter] may waive its rights to make any changes to this Agreement with respect to [Plaintiff]'s failure to meet such Sales Target for those years.  Any such waiver shall not be deemed to be a waiver of [Gutter]'s rights and remedies for any failure to meet any applicable Sales Targets for any future year …

(LA § 6(c)(i) (the "All-Games Waiver")).  According to Plaintiff, Gutter's promises

"that they would not use the Sales Targets to terminate the Agreement"

constituted a waiver pursuant to the All-Games Waiver.  (Pl. Opp. 12-13).

Under the plain meaning of the License Agreement, Defendants could not

have invoked the All-Games Waiver.  The All-Games Waiver is, by its own

terms, retrospective.  That is, the provision indicates that Gutter may execute a

waiver "[i]f [Plaintiff] fails to meet" the All-Games Targets (LA § 6(c)(i)), not, *e.g.*,

"if it appears Plaintiff will fail to meet" such targets.  Because Defendants'

purported promises regarding the Sales Targets are alleged to have occurred

before Plaintiff failed to meet the 2021 All-Games 3X Target — specifically, in

early 2020 and 2021, in the course of the parties' conversations regarding

Plaintiff's performance issues — they do not fall within the reach of the All-

Games Waiver.

Defendants' conduct is also insufficient to amount to a waiver pursuant

to a broader, common-law conception of waiver.  Under New York law,

"[c]ontractual rights may be waived [only] if they are knowingly, voluntarily and

intentionally abandoned."  *Fundamental Portfolio Advisors, Inc.* v. *Tocqueville*

*Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006).  Importantly, waiver "should not be lightly presumed" and must be based on "a clear manifestation of intent" to relinquish a contractual right.  *Gilbert Frank Corp.* v. *Fed. Ins. Co.*, 70 N.Y.2d 966, 968 (1988).  Here, the record is entirely bereft of the kinds of details — *e.g.*, the specific terms of Gutter's promises to Plaintiff, or corroboration of those terms in any contemporaneous communication or writing — from which one could reasonably infer a "clear manifestation of intent" to waive the All-Games Targets.  Accordingly, much in the same way that the Court found that Defendants made no clear and unambiguous promise to Plaintiff not to enforce the Sales Targets, *see* Section B.1.a.i, *supra*, the Court also finds that Defendants did not clearly manifest an intent to waive the Sales Targets.

### iii.    The *Force Majeure* Clause Did Not Excuse Plaintiff's Failure to Meet the Sales Targets

Plaintiff's third argument in support of its claim that Gutter's termination of the License Agreement constituted a breach of that agreement is that the License Agreement's *force majeure* clause (the "*Force Majeure* Clause") excused Plaintiff's failure to meet the Sales Targets so as to invalidate the Termination Attempt.  (Pl. Opp. 16-19).  By way of background, the *Force Majeure* Clause provides:

> Neither party shall be liable for any failure or delay of performance due to any cause beyond its reasonable control, including, without limitation, any act of God, governmental act, fire, strike, labor slowdown, war, riot, terrorism, delays in transportation not within a party's reasonable control, or inability to obtain necessary labor, materials or manufacturing facilities.

28

(LA § 14).  Plaintiff asserts that "the initial motivating reason [for Plaintiff's lackluster performance] was the C[OVID]-19 pandemic and the associated extreme shipping difficulties created by the pandemic," circumstances "clearly within the scope of the *Force Majeure* Clause."  (Pl. Opp. 16-17).  For this reason, according to Plaintiff, dismissing Plaintiff's breach-of-contract claim would thus improperly cause Plaintiff to "be legally harmed by a *force majeure* event."  (*Id.* at 19).

Under New York law, "[*f*]*orce majeure* clauses are to be interpreted in accord with their purpose, which is to limit damages in a case where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond the control of the parties." *Constellation Energy Servs. of N.Y., Inc.* v. *New Water St. Corp.*, 46 N.Y.S.3d 25, 27 (1st Dep't 2017) (internal quotation marks omitted).  The party invoking a *force majeure* clause has the burden of establishing that it applies.  *Beardslee* v. *Inflection Energy, LLC*, 904 F. Supp. 2d 213, 220 (N.D.N.Y. 2012), *aff'd*, 798 F.3d 90 (2d Cir. 2015).  Although *force majeure* clauses "are not to be given expansive meaning," courts will extend their application to "things of the same kind or nature as the particular matters mentioned."  *Kel Kim Corp.* v. *Cent. Markets, Inc.*, 70 N.Y.2d 900, 902-03 (1987) (noting that contractual *force majeure* clauses "provide … [a] narrow defense").  Ultimately, "when the parties have themselves defined the contours of *force majeure* in their agreement, those contours dictate the application, effect, and scope of *force majeure*."  *Route 6*

*Outparcels, LLC* v. *Ruby Tuesday, Inc.*, 931 N.Y.S.2d 436, 438 (3d Dep't 2011) (internal quotation marks omitted).

Plaintiff is correct that many courts have found certain COVID-19-related disruptions to fall within a particular contract's *force majeure* provision. *See, e.g.*, *JN Contemp. Art LLC* v. *Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 501 (S.D.N.Y. 2020) (finding COVID-19-related government-imposed restrictions on business operations fell within *force majeure* clause in agreement to auction painting), *aff'd*, 29 F.4th 118 (2d Cir. 2022); *Nelkin* v. *Wedding Barn at Lakota's Farm, LLC*, 152 N.Y.S.3d 216, 222 (Civ. Ct. 2020) (finding COVID-19-related ban on congregating fell within *force majeure* clause in wedding venue contract). This Court, however, need not determine whether pandemic-related shipping delays constitute "things of the same kind or nature as the particular matters mentioned" in the License Agreement's *Force Majeure* Clause. *Kel Kim*, 70 N.Y.2d at 903. Here, regardless of whether such delays are a *force majeure*, the plain language of the *Force Majeure* Clause prevents Plaintiff from invoking the clause for the purpose of holding Defendants liable for breach of contract.

Importantly, the *Force Majeure* Clause specifies that "[n]either party shall be liable for any failure or delay of performance due to any cause beyond its reasonable control[.]" (LA § 14). The plain meaning of the word "liable" is "[r]esponsible or answerable in law; legally obligated [or] [s]ubject to or likely to incur a fine, penalty, etc." *Liable*, BLACK'S LAW DICTIONARY (11th ed. 2019). Applying this definition to the *Force Majeure* Clause — and cognizant of the *Kel Kim* Court's guidance "not to [give] expansive meaning" to such clause — the

30

Court finds that the *Force Majeure* Clause may only be invoked where one party is seeking to avoid being responsible or answerable in law for its own failure or delay of performance.  *Kel Kim*, 70 N.Y.2d at 903.

Critically, here, Plaintiff is not invoking the *Force Majeure* Clause to avoid being held responsible or answerable in law for its own lackluster performance. Rather, Plaintiff invokes the provision in an effort to hold Gutter responsible or answerable in law notwithstanding Plaintiff's lackluster performance.  Because the Court has found that the *Force Majeure* Clause may only be invoked where one party is seeking to avoid being responsible or answerable in law for its own failure or delay of performance, the Court will not permit Plaintiff to use the *Force Majeure* Clause to hold Defendants liable in spite of Plaintiff's performance.  Accordingly, the Court finds that the *Force Majeure* Clause does not apply.

### iv.        Plaintiff Did Not Cure Its Performance

Plaintiff's fourth argument in support of its claim that Gutter's termination of the License Agreement constituted a breach of that agreement is that Gutter improperly denied Plaintiff the opportunity to demonstrate "reasonable sales uplift" pursuant to the Cure Provision.  (Pl. Opp. 13-16).  To review, any attempt by Gutter to terminate the License Agreement was deemed canceled if Plaintiff was able to demonstrate "reasonable sales uplift" during the three-month period following such attempt, pursuant to the Cure Provision. (LA § 6(d)(ii); *see also* Pl. 56.1 ¶ 8).  Specifically, the Cure Provision indicates that

> [if] [Gutter] provides written notice to [Plaintiff] of [its
> invocation of the Termination Provision], [Plaintiff] shall
> have a period of three [] months from the date of the
> notice to achieve reasonable sales uplift

with respect to each of the Games for which Plaintiff failed to meet the

applicable Sales Targets (the "Underperforming Product(s)").  (LA § 6(d)(ii)(A)).

Further,

> [i]f, at the end of such three[]-month period [Plaintiff]
> provides reasonable evidence that sales for the
> Underperforming Product(s) are expected to meet the
> applicable Sales Targets for the [calendar year] just
> beginning, and [Gutter] (acting reasonably and in good
> faith) agrees in writing with such evidence, then
> [Gutter]'s [invocation of the Termination Provision]
> shall be cancelled …
>
> If, at the end of such three[]-month period [Plaintiff]
> cannot provide reasonable evidence that sales for the
> Underperforming Product(s) are expected to meet the
> applicable Sales Targets for the Term Year just
> beginning, then [Gutter]'s [invocation of the
> Termination Provision] will become immediately
> effective.

(*Id.*).

Turning to the facts at hand, in the three months following the

Termination Attempt, Plaintiff's sales volume was roughly the same as for the

same period in 2021.  (Def. 56.1 ¶ 45).  As the Court noted earlier, at the end of

April 2022, Plaintiff reported sales of 52,370 units of the Games between

January 1 and March 30, 2022, slightly less than the 57,444 units that

Plaintiff had sold during the same period in 2021.  (*Id.*).  On the basis of this

report, Perch concluded that  "given [Plaintiff's] performance was flat year-on-

year and [Plaintiff] didn't meet [the] [S]ales [T]argets in 2021, there was no

indication that [Plaintiff] would make [the] [S]ales [T]argets in 2022." (Curley Decl., Ex. L ("Hartigan Depo. Tr.") at 196:17-20).

Unfortunately, the License Agreement does not define what is meant by "reasonable sales uplift." But, under any reasonable interpretation of the phrase, the Court cannot conclude that Plaintiff's early 2022 performance demonstrated "reasonable sales uplift" sufficient to invoke the Cure Provision. Looking first to the ordinary meaning of "reasonable sales uplift," the phrase appears to require, at a minimum, evidence of a moderate increase in sales. *See Reasonable*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "reasonable" as "[w]ithin sensible or rational limits; not excessive; moderate"); *Uplift*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining "uplift" as "[a]n increase (in prices, wages, etc.)"). Of course, applying this definition, no reasonable person could conclude that Plaintiff has demonstrated "reasonable sales uplift"; Plaintiff proffers no evidence of any increase in its sales of the Games, let alone a moderate one.

The Court also looks to the License Agreement for guidance on the meaning of the phrase. The Cure Provision indicates that Plaintiff can demonstrate "reasonable sales uplift" by "provid[ing] reasonable evidence that sales for Underperforming Products [we]re expected to meet the applicable Sales Targets for the [calendar year] just beginning." (LA § 6(d)(ii)(A); *see also* Pl. 56.1 ¶ 43). Applying this standard, the Court again cannot conclude that Plaintiff has demonstrated "reasonable sales uplift." Because Plaintiff's 2021 sales fell far short of the All-Games 3X Target (and many of the Per-Game 3X

Targets) for that calendar year, Plaintiff's flat sales in early 2022 cannot be construed as "reasonable evidence that sales for Underperforming Products are expected to meet the applicable Sales Targets for [2022]."  (LA § 6(d)(ii)(A)).

Plaintiff offers two arguments in response.  *First*, Plaintiff contends that its results provide "reasonable evidence that sales for Underperforming Products [we]re expected to meet the applicable Sales Targets for [2022]" because Plaintiff's early 2022 sales the Games "far exceeded" the applicable Per-Game and All-Games Quantity Targets.  (LA § 6(d)(ii)(A); *see* Pl. Opp. 13-15).  For instance, the All-Games Quantity Target for 2022 was 60,000 units (*see* LA Sched. C), and during the period from January 1 to April 21, 2022, Plaintiff sold 61,613 units of the Games (Pl. 56.1 ¶ 118).  Of course, these results provide "reasonable evidence that sales for Underperforming Products [we]re expected to meet" the Quantity Targets; they do not, however, do the same as to the 3X Targets.  Because a showing of "reasonable sales uplift" under the License Agreement requires evidence that all "applicable" Sales Targets will be met, evidence that only the Quantity Targets will be met is insufficient.

*Second*, Plaintiff claims that it would have demonstrated "reasonable sales uplift" in the three months following the Termination Attempt but for Defendants' earlier representation that one of the bases for Defendants' termination of the License Agreement was the Change-of-Control Provision.  (Pl. 56.1 ¶ 45).  The Court is equally unpersuaded by this argument.  In their January 21, 2022 letter, Defendants made it clear to Plaintiff that they were

34

terminating the License Agreement on the basis of both the Change-of-Control Provision and Plaintiff's failure to meet the Sales Targets. (Def. 56.1 ¶ 42; *see generally* Curley Decl., Ex. I (January 21, 2022 letter from Perch to Plaintiff)). Further, in late 2021, Plaintiff had communicated to the Waltons its belief that the Change-of-Control Provision was an invalid basis for terminating the License Agreement. (*See* Mooney Decl., Ex. G (deposition testimony of Perch employee Emily Brockaway) at 85:10-86:14 (indicating that Plaintiff "was not understanding the change of control clause like [Perch] w[as]," *i.e.*, as a valid basis for terminating the License Agreement, as of December 2021)). Accordingly, in early 2022, Plaintiff was on notice that it had a chance to successfully challenge the Termination Attempt — and specifically, Defendants' invocation of the Termination Provision — but only if it could demonstrate "reasonable sales uplift" in the three months that followed the Termination Attempt.

For the foregoing reasons, the Court finds Plaintiff did not cure its performance pursuant to the License Agreement's Cure Provision. Further, because none of Plaintiff's theories — estoppel, wavier, *force majeure*, or cure — serves to invalidate Defendants' termination of the License Agreement, the Court finds that Defendants' termination was proper. And, because Defendants' termination of the License Agreement was proper, there is insufficient evidence to demonstrate breach. As such, Defendants are entitled to summary judgment on Plaintiff's breach-of-contract claim.

### b.    Plaintiff Is Not Entitled to Lost Profits Damages

As an alternative basis for summary dismissal of Plaintiff's breach-of-

contract claim, Defendants argue that Plaintiff cannot establish damages.  Of

course, "[t]o state a valid claim for breach, Plaintiff[] must allege valid

damages."  *Negrete* v. *Citibank, N.A.*, 187 F. Supp. 3d 454, 469 (S.D.N.Y. 2016)

(citing *Fischer & Mandell, LLP* v. *Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir.

2011)), *aff'd*, 759 F. App'x 42 (2d Cir. 2019) (summary order).  Here, Plaintiff

seeks to recover "the profits that it lost due to Defendants' breach."  (Pl.

Opp. 19 ("Plaintiff seeks to recover the profits that it lost due to Defendants'

breach of the [License] Agreement.  That is precisely the damage that

Defendants caused by terminating the [License] Agreement, and precisely the

damages that directly and necessarily were caused by the termination.");  *see*

*also* Curley Decl., Ex. R (Plaintiff's Revised Rule 26 Disclosures) at 3-15 (listing,

under "Damages," "[e]stimated [p]rofits" for calendar years 2022-2034 for each

of the Games)).  But, according to Defendants (Def. Br. 22-23), the lost profits

damages that Plaintiff seeks are not valid damages under the License

Agreement, as Section 13 of that Agreement plainly precludes their recovery:

> Limitation of Liability. ... IN NO EVENT WILL EITHER
> PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL,
> INCIDENTAL, PUNITIVE OR CONSEQUENTIAL
> DAMAGES, INCLUDING BUT NOT LIMITED TO ... LOST
> PROFITS OR REVENUE, EVEN IF SUCH PARTY HAS
> BEEN ADVISED OF THE POSSIBILITY OF SUCH
> DAMAGES AND EVEN IF SUCH DAMAGES ARE
> REASONABLY FORESEEABLE, WHETHER SUCH
> LIABILITY IS BASED ON CONTRACT, TORT,
> WARRANTY, OR ANY OTHER LEGAL OR EQUITABLE
> GROUNDS.

(LA § 13 (the "Limitation-of-Liability Provision")).

Generally speaking, under New York law, contractual limitation-of-liability provisions, "which represent[] the parties' [a]greement on the allocation of the risk of economic loss in the event that contemplated transaction is not fully executed," are enforceable. *Metro. Life Ins. Co.* v. *Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994); *accord Negrete*, 187 F. Supp. 3d at 469. These provisions often preclude recovery of so-called "consequential" or "special" damages, or damages that do not "directly flow" from a breach of contract. *Am. List Corp.* v. *U.S. News & World Rep., Inc.*, 75 N.Y.2d 38, 43 (1989). On the other hand, "general" damages, which are typically not contractually limited, "are the natural and probable consequence of the breach" of a contract. *Id.* So-called "lost profits" damages, *i.e.*, the type at issue here, can be either general or consequential damages, depending on whether (i) the non-breaching party bargained for such profits and (ii) such profits constitute "the direct and immediate fruits of the contract." *Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 109 n.20 (2d Cir. 2007).

Determining whether the lost profits damages that Plaintiff seeks constitute "general" or "consequential" damages requires a careful review of the relevant case law. Here, both parties invoke the New York Court of Appeals' decision in *Biotronik A.G.* v. *Conor Medsystems Ireland, Ltd.* in support of their respective positions. 22 N.Y.3d 799 (2014). In *Biotronik*, Biotronik A.G. ("Biotronik"), a manufacturer and distributor of medical devices, and defendant Conor Medsystems Ireland, Ltd. ("Conor"), the developer and manufacturer of a

drug-eluting coronary stent, entered into an agreement designating Biotronik
as the exclusive distributor of Conor's stent in a particular geographic territory.
*Id.* at 802.  The agreement required Biotronik to make a minimum monthly
order of the stents from Conor, guaranteeing Conor a set number of sales each
month.  *Id.* at 803.  During the course of the agreement, in the face of
unanticipated regulatory hurdles, Conor recalled its stents from the market.
*Id.* at 804.

Biotronik sued Conor for breach of contract and sought damages for lost
profits related to its resales of Conor's stent.  *Biotronik*, 22 N.Y.3d at 804.
Importantly, the parties' distribution agreement included the following
limitation-of-liability provision:

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER
> FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL,
> INCIDENTAL OR PUNITIVE DAMAGE WITH RESPECT
> TO ANY CLAIM ARISING OUT OF THIS AGREEMENT
> (INCLUDING     WITHOUT     LIMITATION     ITS
> PERFORMANCE OR BREACH OF THIS AGREEMENT)
> FOR ANY REASON.

*Id.* at 803.  Biotronik argued that its claim for lost profits on the resale of
Conor's stent constituted general damages, and as such fell outside the scope
of the agreement's limitation-of-liability provision, which barred recovery of
"indirect, special, consequential, incidental[,] or punitive damage[s]."  *Id.* at
804.

Overturning the Appellate Division, which had affirmed the Supreme
Court, the Court of Appeals held that, under the parties' agreement, lost profits
constituted general damages.  *Biotronik*, 22 N.Y.3d at 804-05.  Under the

parties' agreement, "Biotronik was appointed Conor's exclusive distributor and was required to buy [its] stents from Conor and pay Conor a fixed percentage of Biotronik's sales"; Biotronik's "mark-up, or gross profits, [was] incorporated into the very terms of the parties' agreement." *Biotronik, A.G.* v. *Conor Medsystems Ireland, Ltd.*, 939 N.Y.S.2d 739, 739 (Sup. Ct. 2011). For this reason, the Court of Appeals held that "any lost profits resulting from [Conor's] breach would be the 'natural and probable consequence' of that breach." *Biotronik*, 22 N.Y.3d at 808-09 ("[I]t cannot be said that [Conor] did not agree to pay [the lost profits sought by Biotronik] under the contract ... [Conor] sought to enter a market unavailable to it by capitalizing on [Biotronik]'s distribution network ... both [Conor] and [Biotronik] depended on the product's resale for their respective payments.").

Importantly, *Biotronik* stands for the proposition that a court must "look at the underlying agreement to determine whether lost profits [are] general damages," and *not* that lost profits damages always, or even regularly, constitute general damages. *Biotronik*, 22 N.Y.3d at 807 ("Such a bright-line rule violates the case-specific approach we have used to distinguish general damages from consequential damages."). And while the facts of *Biotronik* are not dissimilar to those at hand, a key distinction remains: The License Agreement's Limitation-of-Liability Provision explicitly lists "lost profits or revenue" as a type of consequential damages. (*See* LA § 13 ("IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY ... CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO ... LOST PROFITS OR REVENUE[.]")).

Thus, following *Biotronik*'s instruction to "look[] at the underlying agreement," *Biotronik*, 22 N.Y.3d at 807, the Court finds that the parties intended for lost profits damages to be covered by the Limitation-of-Liability Provision.  *Negrete*, 187 F. Supp. 3d at 469 (finding lost profits damages precluded where limitation-of-liability provision indicated that "[n]o party shall be required to pay or be liable to the other party for any consequential, indirect or punitive damages, opportunity costs or lost profits"); *Great Earth Int'l Franchising Corp.* v. *Milks Dev.*, 311 F. Supp. 2d 419, 423 (S.D.N.Y. 2004) (finding lost profits damages precluded where limitation-of-liability provision indicated that "[n]othing in this Agreement shall obligate Franchisor in respect of any claim by Master Franchisee … including, without limitation, … any claim for lost profit or for consequential damages").

For this reason, the damages Plaintiff seeks on its breach-of-contract claim are precluded by the License Agreement, and Plaintiff lacks a valid claim for damages.  Plaintiff's failure to establish damages thus constitutes an alternative ground upon which the Court may grant Defendants' motion for summary judgment on Plaintiff's breach-of-contract claim.[7]

---

[7]    The Court rejects out of hand Plaintiff's argument that the Limitation-of-Liability Provision is unconscionable.  As a general matter, limitation of liability clauses like the one at issue in this case are routinely enforced.  *See, e.g.*, *Five Star Dev. Resort Cmtys., LLC* v. *iStar RC Paradise Valley, LLC*, No. 09 Civ. 2085 (LTS), 2012 WL 4119561, at *3 (S.D.N.Y. Sept. 18, 2012); *Metro. Life Ins. Co.* v. *Noble Lowndes Int'l, Inc.*, 600 N.Y.S.2d 212, 215 (1st Dep't 1993) ("[I]n a strictly commercial context, a provision limiting recovery is [generally] enforceable according to its terms[.]"), *aff'd*, 84 N.Y.2d 430 (1994).  Moreover, Plaintiff has not made any showing that the Limitation of Liability Provision deprived Plaintiff of "at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract."  *Wilson Trading Corp.* v. *David Ferguson, Ltd.*, 23 N.Y.2d 398, 403 (1968)).

### 2.    The Court Grants Defendants Summary Judgment on Plaintiff's Implied-Covenant Claim

Defendants also seek summary judgment on Plaintiff's related claim for breach of the implied covenant of good faith and fair dealing.  "Under New York law … '[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.'"  *Woodard* v. *Reliance Worldwide Corp.*, No. 18 Civ. 9058 (RA), 2019 WL 3288152, at *2 (S.D.N.Y. July 22, 2019) (alteration in original) (quoting *Dalton* v. *Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)), *aff'd*, 819 F. App'x 48 (2d Cir. 2020) (summary order).  "This [obligation] embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Dalton*, 87 N.Y.2d at 389 (quoting *Kirke La Shelle Co.* v. *Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)).  Stated differently, "[a] claim for breach of this covenant may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain."  *Dreni* v. *PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 729 (S.D.N.Y. 2020) (internal quotation marks omitted).

Importantly, the protection afforded to contracting parties by the implied covenant "cannot exist in the absence of an underlying valid contract."  *ARI & Co.* v. *Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003); *see also Alter* v. *Bogoricin*, No. 97 Civ. 662 (MBM), 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997) ("[T]he covenant of good faith and fair dealing is not distinct from the underlying contract[.]").  A corollary to this principle is that an implied

covenant claim must fail where "a breach of contract claim, based upon the same facts, is also pled." *Cruz* v. *FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (internal quotation marks omitted); *see also ARI*, 273 F. Supp. 2d at 523 ("Because the facts that constitute the breach of the implied covenant claim readily could have been encompassed in [plaintiff]'s breach of contract claims, [it] must be dismissed as a separate cause of action.").

Finally, while appearing to invite in a broad variety of claims, the implied covenant of good faith and fair dealing is narrowly circumscribed in its application. Specifically, the implied covenant "cannot be used ... to create, in essence, new, affirmative duties ... that were not expressly set forth in [an agreement]." *Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*, 650 F. Supp. 2d 314, 324 (S.D.N.Y. 2009) (internal quotation marks and citations omitted), *aff'd*, 976 F.3d 239 (2d Cir. 2020); *see also Metro. Life Ins. Co.* v. *RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989) (refusing to "permit [the] implied covenant to shoehorn into [a contract] additional terms plaintiffs now wish had been included").

Here, Plaintiff claims that Defendants breached the implied covenant in at least two ways: Gutter (i) "repeatedly requested that Plaintiff not take the steps that it could have taken to meet the [] Sales Target[s], and repeatedly promised that it would not use the Sales Targets as a putative justification for terminating the Agreement," and (ii) "intentionally entered into a contract with Perch in which G[utter] required Perch to purport to terminate the [License] Agreement, whether or not there was any legitimate basis for such a purported

termination." (Pl. Opp. 25).  In Plaintiff's view, these actions "[had] the effect of destroying or injuring [Plaintiff's] right … to receive the fruits of the contract." (*Id.*).

Starting with the first basis — that Gutter "repeatedly requested that Plaintiff not take the steps that it could have taken to meet the [] Sales Target[s], and repeatedly promised that it would not use the Sales Targets as a putative justification for terminating the Agreement" — the Court finds that Plaintiff's claim fails as a matter of law.  (Pl. Opp. 25).  The gravamen of Plaintiff's breach-of-contract claim is that Defendants' invocation of the Termination Provision was improper in view of Defendants' purported reassurances that Plaintiff's failure to meet the Sales Targets would not be held against them.  To the extent Plaintiff's implied-covenant claim shares this factual premise, the claim must be dismissed.  *See Friedman* v. *Maspeth Fed Loan and Sav. Ass'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014) ("Under New York law, the same facts cannot give rise to both a claim for breach of contract and a claim for breach of implied duty of good faith and fair dealing.").

Furthermore, that Gutter "repeatedly requested that Plaintiff not take the steps that it could have taken to meet the [] Sales Target[s]" is not sufficient to implicate the implied covenant of good faith and fair dealing.  (Pl. Opp. 25).  Namely, Plaintiff indicated that it was not required to agree to Gutter's requests (*see* Curley Decl., Ex. C ("TWSS 30(b)(6) Depo. Tr.") at 211:14-16 ("[We] agree[d] that [selling the Games at discount stores] probably wasn't the best thing to do if we wanted to try to get into a big box store [in 2022].")), and, anyway, that it

believed complying with such requests was in its own long-term best interests
(Myers Decl. ¶ 24 ("In light of the fact that not taking the extraordinary steps
that would allow meeting the [All-Games 3X] Target would be better for both
[parties] in the long run, we agreed not to take [] extra steps to increase unit
sales in 2021."))  Under these circumstances, Defendants' conduct cannot be
said to evidence "some improper motive" or amount to an effort to "deprive[]
[Plaintiff] of the benefit of its bargain."  *Dreni*, 486 F. Supp. 3d at 729-31.

Plaintiff's implied covenant claim also cannot stand on the second alleged
factual basis: that Gutter "intentionally entered into a contract with Perch in
which G[utter] required Perch to purport to terminate the [License] Agreement,
whether or not there was any legitimate basis for such a purported
termination."  (Pl. Opp. 25).  There is nothing in the record, other than
Plaintiff's own declarations, that supports the notion that Perch was under an
obligation to terminate the agreement whether or not Perch had a legal basis to
do so.  *See Arnow* v. *Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 482
(S.D.N.Y. 2013) ("[S]elf-serving, conclusory affidavits, standing alone, are
insufficient to create a triable issue of fact and to defeat a motion for summary
judgment.").  To wit, the series of (undated) Slack messages between Perch
employees that Plaintiff proffers in support of its theory says nothing of the
sort.  (Pl. 56.1 ¶ 108; *see generally* Mooney Decl., Ex. F).

Even if Plaintiff's implied-covenant claim had some valid factual basis
distinct from that of its breach-of-contract claim, however, the claim still fails
to survive Defendants' motion for summary judgment.  A claim for breach of

44

the implied covenant of good faith and fair dealing may be dismissed if "the relief sought by plaintiff is intrinsically tied to the damages allegedly resulting from the breach of contract." *Bogoricin*, 1997 WL 691332, at *8 (alterations adopted) (internal quotation marks omitted); *see also EFG Bank AG, Cayman Branch* v. *AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 94 (S.D.N.Y. 2018) (dismissing implied-covenant claim where "the damages [p]laintiffs s[ought] as a result of [defendant]'s alleged [breach of the implied covenant] [were] identical to the damages they s[ought] for the alleged breach of contract"); *Amcan Holdings, Inc.* v. *Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 50 (1st Dep't 2010) (dismissing implied-covenant claim that "s[ought] the identical damages" as breach of contract claim); *ARI*, 273 F. Supp. 2d at 523 ("The breach of the implied covenant claim must also be dismissed because the damages it seeks to recover are identical to those asserted in the breach of contract claims.").

Plaintiff here seeks a single sum of $35,000,000 as damages for Defendants' breach of contract and breach of the implied covenant. (Compl. ¶¶ 55, 60, 64). The Complaint therefore intimates that the two claims resulted in the same, indivisible injury. (*Cf. id.*). Because the damages associated with Plaintiff's implied-covenant claim are part and parcel of the damages associated with Plaintiff's breach-of-contract claim, the Court finds that Plaintiff's implied-covenant claim cannot proceed. Accordingly, the Court grants Defendants summary judgment on Plaintiff's implied-covenant claim.

### 3.      The Court Grants Gutter Summary Judgment on Its Counterclaims

As noted, Gutter brings three counterclaims against Plaintiff, specifically, for (i) breach of contract, (ii) specific performance, and (iii) attorneys' fees.  (*See generally* Dkt. #20).  Plaintiff argues that Defendants are not entitled to summary judgment on their counterclaims for the same reasons that Plaintiff is entitled to summary judgment on its claims.  (*See* Pl. Opp. 26).  Accordingly, the Court has already addressed, and discharged, Plaintiff's relevant objections herein.  Nonetheless, for the sake of completeness, the Court briefly addresses each of Gutter's claims in turn, concluding that Gutter is entitled to summary judgment on each.

### a.      Gutter Is Entitled to Summary Judgment on Its Breach-of-Contract Claim

Gutter's first claim against Plaintiff is for breach of contract, stemming from Plaintiff's withholding of certain royalty payments due to Gutter.  (Def. Br. 25).  As the Court previously explained, under New York law, the elements of a breach-of-contract claim are: (i) existence of a contract, (ii) performance of the contract by one party, (iii) breach by the other party, and (iv) damages.  *See Terwilliger*, 206 F.3d at 245-46.  Further, "[w]here the question of liability turns on applying the unambiguous language of a contract to undisputed facts," a court may grant summary judgment on a breach-of-contract claim.  *Murex*, 500 F. Supp. 3d at 94.

Here, the License Agreement provides that Plaintiff "shall pay [Gutter] a royalty of 8% (the 'Royalty') of Gross Revenue . . . from the sale of each [Game],"

which payment was to be made "by the last day of the calendar month following the end of each calendar quarter, for Gross Revenue received by [Plaintiff] during such quarter."  (LA § 5(a)).  What is more, there is no dispute that Plaintiff continued to make and report to Gutter on sales of the Games after the Termination Attempt.  (Def. 56.1 ¶¶ 48-49 (citing Curley Decl., Ex. J (April 29, 2022 Letter from Richard Mooney); *id.*, Ex. K (TWSS 2022 Commission Tracker); Gulamhussein Depo. Tr. 230:15-25); Pl. 56.1 ¶¶ 48-49 (indicating facts undisputed)).  There is also no dispute that Plaintiff has not paid Gutter for those sales and has told Gutter that it is withholding at least $114,500.86 in payments.  (Def. 56.1 ¶¶ 48-49 (citing Curley Decl., Ex. M (August 4, 2022 Letter from Richard Mooney); *id.*, Ex. N (October 28, 2022 Letter from Richard Mooney); *id.*, Ex. O (March 15, 2023 Letter from Richard Mooney)); Pl. 56.1 ¶¶ 48-49 (indicating facts undisputed)).

Accordingly, having found that Gutter is not in breach of the contract, *see* Section B.1, *supra*; that Plaintiff has not fulfilled its obligation to make royalty payments to Gutter under the contract; and that Gutter is owed at least $114,500.86 in royalty payments, the Court finds that Gutter is entitled to summary judgment on its breach-of-contract claim.

### b.    Gutter Is Entitled to Specific Performance

Gutter's second claim is for specific performance, specifically, for "an order directing TWSS to provide Gutter Games with (i) TWSS's current inventory of Gutter Games products, broken down by product name; and (ii) the cost that TWSS paid for its inventory on a product-by-product basis."

(Dkt. #20 ¶ 20). Under New York law, a party seeking specific performance must establish (i) "the existence of a contract"; (ii) the opposing party's "breach of that contract by non-performance"; and (iii) its own "substantial performance of its obligations under the [contract] and its ability and willingness to undertake any additional steps required of it under the contract." *Edge Grp. WAICCS LLC* v. *Sapir Grp. LLC*, 705 F. Supp. 2d 304, 312 (S.D.N.Y. 2010). Finally, the party must (iv) "demonstrate that the invocation of the court's powers in equity is justified by the absence of an adequate remedy at law," *id.*, and the party's "risk of injury ... is one that after balancing the equities entitles it to relief," *Nemer Jeep-Eagle* v. *Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993).

As previously noted, Plaintiff had certain reporting obligations under the License Agreement, including an obligation that:

> [b]y the last day of the calendar month following the end of each calendar quarter of the Term, [Plaintiff] shall provide [Gutter] with the following data for the quarter just ended: ... (v) [Plaintiff]'s then-current inventory levels for [the Games][.]

(LA § 7(a)). The License Agreement also provides that:

> [u]pon termination or expiration of this Agreement for any reason ... (vii) [Gutter] [has] the right, but not the obligation, to purchase from [Plaintiff] some or all of [Plaintiff]'s remaining inventory of [the Games], for a purchase price equal to the price paid by [Plaintiff] for such [Games][.]

(*Id.* § 9(g)). According to Defendants, following the Termination Attempt, Gutter "tried to ascertain from TWSS information concerning its current inventory of

[Games]"; while Plaintiff "eventually provided Gutter [] with a breakdown of its [then-]current inventory," it never "delineated the price that it paid to the manufacturer for th[o]se products."  (Dkt. #20 ¶¶ 15-17).

The Court's preceding analysis has already established "the existence of a contract," Plaintiff's "breach of that contract," and Gutter's "substantial performance of its obligations under the [contract]," *see* Sections B.1, 3.a, *supra. Edge Grp.*, 705 F. Supp. 2d at 312.  The question before the Court, then, is whether Gutter has "demonstrate[d] that the invocation of the court's powers in equity is justified by the absence of an adequate remedy at law," *id.*, and that Gutter's "risk of injury ... is one that after balancing the equities entitles it to relief," *Nemer Jeep-Eagle*, 992 F.2d at 433.

Importantly, courts have found it appropriate to exercise their equitable powers in favor of granting specific performance of books-and-records provisions, like the kind at issue here, particularly in the context of indemnity agreements.  *See, e.g.*, *Colonial Sur. Co.* v. *A&R Cap. Assocs.*, 420 F. Supp. 3d 38, 48-49 (E.D.N.Y. 2017) (granting specific performance with respect to books and records clause of indemnity agreement); *Ohio Cas. Ins. Co.* v. *Fratarcangelo*, 7 F. Supp. 3d 206, 217 (D. Conn. 2014) (same); *cf. Int'l Fid. Ins. Co.* v. *Vimas Painting Co.*, No. 07 Civ. 298 (AWT), 2009 WL 2243769, at *9 (S.D. Ohio July 23, 2009) (ordering defendant "to provide [plaintiff] reasonable access to [its] books, records, and accounts" in view of the facts that (i) "the [parties'] [a]greement expressly guarantee[d] [plaintiff] the right to reasonable access to [d]efendant's books, records, and accounts" and (ii) defendant did not

"present any evidence creating a genuine issue of material fact with respect to this issue"). As in those cases, while granting specific performance here "will merely place the parties in the position they have already bound themselves to be contractually" (*i.e.*, give Gutter access to information it is entitled to under the License Agreement), denying specific performance "will prevent [Gutter] from realizing the benefit of its bargain" (*i.e.*, disable Gutter from buying back Plaintiff's leftover inventory of Games). *Fratarcangelo*, 7 F. Supp. 3d at 217. Further, "although the amount of harm [Gutter] would suffer from not having access to the requested records may not be easily discernable, [Plaintiff] ha[s] pointed to no harm that [it] will suffer if [it is] forced to comply with [Gutter]'s document request." *Id.* Accordingly, the Court finds that "the balance of equities favors granting summary judgment" on Gutter's claim. *Id.*

### c. Gutter Is Entitled to Summary Judgment on Its Claim for Attorneys' Fees

Finally, Gutter argues that it is entitled to reasonable attorneys' fees and costs as set forth in the License Agreement. Under New York law, "attorney[s'] fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute[,] or court rule." *Hooper Assocs., Ltd.* v. *AGS Computers, Inc.*, 74 N.Y.2d 487, 491 (1989). Where an award of attorneys' fees is purportedly authorized by contract, a court "should not infer a party's intention to waive the benefit" of the default rule — that each party is responsible for its own attorneys' fees — "unless the intention to do so is unmistakably clear from the language of the [parties'] promise." *Id.* at 492.

50

Here, the License Agreement provides, in relevant part, that "[i]n the event of a dispute arising out of or relating to this [License] Agreement, the prevailing party shall be entitled to receive from the other party its reasonable attorneys' fees and costs." (LA § 16). The plain language of this provision makes it "unmistakably clear that the parties intended to provide for payment of attorneys' fees relating to disputes between themselves." *4Kids Ent., Inc.* v. *Upper Deck Co.*, 797 F. Supp. 2d 236, 252 (S.D.N.Y. 2011); *see also Ozbakir* v. *Scotti*, 906 F. Supp. 2d 188, 192-93 (W.D.N.Y. 2012) (permitting award of attorneys' fees in dispute between contracting parties where fee provision applied to "any litigation, arbitration[,] or other legal proceeding which may arise between any of the parties hereto"). Accordingly, the Court finds that Gutter, as the prevailing party, is entitled to reasonable attorneys' fees and costs.

## CONCLUSION

In accordance with the foregoing analysis, the Court hereby GRANTS Defendants' motion for summary judgment on all of Plaintiff's claims, dismissing the Complaint in its entirety. The Court further GRANTS Defendants' motion for summary judgment as to Gutter's counterclaims. The Clerk of Court is directed to terminate the motions pending at docket entries 73 and 79.

In view of the fact that the parties did not submit briefing on the specific amount of damages and attorneys' fees that are owed to Defendants for Plaintiff's breach of contract, to which the Court has now determined

Defendants are entitled, the Court hereby REFERS this case to Magistrate Judge Aaron for the purposes of an inquest concerning such damages and fees. A referral order will issue under separate cover. The parties are, of course, invited to meet and confer prior to the inquest to determine if any agreement can be reached regarding the amount of damages or attorneys' fees without the need for further litigation.

      SO ORDERED.

Dated:      August 5, 2024
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

52